| UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK | 14 CV 9142 (ALC) |
|---|---|
| -------------------------------------------------X | Courtroom 1306 |
| CHARLES MEYERS, et al. | **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS [F.R.C.P. Rule 12(b)(6)] OF DEFENDANTS CITY OF NEW YORK; MICHAEL RUBENS BLOOMBERG,** individually and in his official capacity as former Mayor of the City of New York; former NYPD Chief of Department JOSEPH J. ESPOSITO, individually and in his official capacity; former NYPD Commissioner RAYMOND KELLY, individually and in his official capacity |
| Plaintiffs, | |
| vs. | |
| CITY OF NEW YORK, et al. | |
| Defendants. | |
| -------------------------------------------------X | |

Dated: May 13, 2015

Respectfully submitted,

/S/

PAUL L. MILLS
LAW OFFICE OF PAUL L. MILLS
Park West Finance Branch
P.O. 20141
New York, NY 10025

# TABLE OF CONTENTS

I. INTRODUCTORY STATEMENT AND DEFINITION OF TERMS.............................................1

II. STATEMENT OF FACTS ......................................................................................................2

III. DISCUSSION ........................................................................................................................3

a. The Eviction had to comply with Plaintiffs' rights under the 14th and 4th Amendments. ..............3

b. Defendants' Legally-Binding Public Statements. ..........................................................3

c. The actions of the policymaker Defendants support City's Monell liability. ...................................4

d. City's zoning code created a constitutionally-protected easement for 24-hour use of the Park without a stay duration limit. ..........................................................................5

e. Plaintiffs' 14th Amendment property rights entitled them to some degree of Due Process prior to an eviction. ..........................................................................7

f. Because Defendants had an ample opportunity to obtain a court order, 14th Amendment Due Process required a prior hearing. ..........................................................................8

g. Plaintiffs' 4th Amendment reasonable expectation of privacy made eviction from their homes without a warrant unlawful. ..........................................................................10

h. Defendants' Surprise "Squatter/Licensee" Argument.................................................................11

i. Defendants' "Retro" 1950s-Era Legal Doctrine Purporting to Once Again Criminalize Passive Disobedience of Unlawful Orders from a Private Owner or Cooperating Police. .................11

j. There was no uncertainty about the Park's "hybrid status", or any other basis for Qualified Immunity. ..........................................................................16

k. Plaintiffs' Malicious Prosecution claim is properly pleaded. ........................................................17

l. Defendants acted in retaliation against Plaintiffs' 1st Amendment activities. ..............................18

m.  Enforcement of the private owner's broad rule prohibiting any structure to be erected in a traditional public forum violated the 1st Amendment. ....................................................................... 19

n.  The Park was a Traditional Public Forum. .................................................................... 23

IV.  CONCLUSION ..................................................................................................................... 25

# TABLE OF AUTHORITIES

Cases

*ACLU of Nevada v. City of Las Vegas*, 333 F.3d 1092, 1101 (9th Cir. 2003)..............................7

*Alexandre v. Cortes*, 140 F.3d 406, 411 (2d Cir. 1998) .................................................................9

*Arum v. Miller*, 273 F.Supp.2d 229, 235 (EDNY 2003) ..............................................................12

*Berger v. Schmitt*, 91 Fed.Appx. 189 (2nd Cir. 2004) .................................................................14

*Blue v. Koren*, 72 F3d 1075, 1084 (2d Cir. 1995) .......................................................................18

*Brown v. City of New York*, 13cv1018 [2014 U.S. Dist. LEXIS 83513 (S.D.N.Y. 2014)].....13, 20

*California v. Ciraolo*, 476 U.S. 207, 212 (1986).........................................................................10

*Cerrone v. Brown*, 246 F.3d 194, 203 (2d Cir. 2001) ..................................................................16

*Citizens To End Animal Suffering And Exploitation, Inc. v. Faneuil Hall Marketplace, Inc.*,
   745 F. Supp. 65 (D. Mass. 1990) .............................................................................................6

*Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) ......................................................18

*Engblom v. Carey*, 677 F.2d 957, 964 (2d. Cir. 1982)...............................................................7, 8

*Escalera v. New York City Housing Authority*, 425 F.2d 853 (2d Cir. 1970) .......................3, 7, 8

*Faruki v. City of New York*, 517 Fed.Appx. 1, 2013 U.S. App. LEXIS 2619 (2d Cir. 2013).......14

*First Unitarian Church of Salt Lake City v. Salt Lake City Corp.*, 308 F.3d 1114, 1123 (10th
   Cir. 2002).................................................................................................................................7

*Frisby v. Schultz*, 487 U.S. 474, 484-88 (1988) .........................................................................19

*Hague v. CIO*, 307 U.S. 496, 515 (1939)......................................................................................6

*Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 880 (2d Cir.
   1996)..........................................................................................................................................9

*Hotel Employees v. City of New York Department of Parks & Recreation,* 311 F.3d 534 (2d Cir.
   2002).........................................................................................................................................24

*In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig*, 763 F. Supp. 2d 423, 581
   (S.D.N.Y. 2011)........................................................................................................................2

*In re Verna C.*, 531 N.Y.S.2d 344, 345 (2d Dep't 1988)..............................................................12

*Ionosphere Clubs, Inc. v. Ins. Co. of PA (In re Ionosphere Clubs, Inc.)*, 85 F.3d 992, 999 (2d
   Cir.1996)....................................................................................................................................4

*Johnson v. City of New York*, 5cv7519 [2008 U.S. Dist. LEXIS 78984 (S.D.N.Y. 2008)] ..........13

*Katz v. U.S.* 389 U.S. 347, 351-52 (1967) ...............................................................................3, 10

*Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983) .....................................................................12

*Lebowitz v. City of New York*, 2014 U.S. Dist. LEXIS 25515, *9 (S.D.N.Y. 2014) ....................14

*Lennon v. Miller*, 66 F.3d 416 (2nd Cir. 1995)............................................................................12

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434 (1982).....................................................3, 8

*Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) ............................................................................5

*Marcavage v. City of New York*, 689 F.3d 98 (2nd Cir. 2012).....................................................13

*Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S. Ct. 893, 902, 47 L. Ed. 2d 18 (1976)..................8

*Matthes v. East Fishkill*, 785 F.2d 43 (2nd Cir. 1986)................................................................14

*Mullin v. Gettinger*, 450 F.3d 280, 285-286 (7th Cir. 2006)......................................................18

*Nassau Trust v. Montrose Concrete Prod. Corp.*, 56 N.Y.2d 175, 451 N.Y.S.2d 663, 436 N.E.2d
   1265,1269-70 (1982)................................................................................................................4

*Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 433–34 (2d Cir. 2010)..........17

*Owen v. City of Independence*, 445 U.S. 622, 657 (1980) ...........................................................16

*Parratt v. Taylor*, 451 U.S. 527, 539, 101 S. Ct. 1908, 1915, 68 L. Ed. 2d 420 (1981)................8

*Pelt v. City of New York*, 2013 U.S. Dist. LEXIS 122848, *41 (E.D.N.Y. 2013).........................9

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 482-85 (1989)..................................................5

*People v Nunez*, 36 Misc. 3d 172 (N.Y. City Crim. Ct. 2012)...............................................21, 23

*People v. Galpern*, 259 N.Y. 279 (1932) ................................................................15

*People v. Joseph*, 156 Misc 2d 192 [Crim Ct, Kings County, 1992].......................................13

*People v. Leonard* 62 N.Y.2d 404 (1984) ..............................................................12

*People v. Lupinacci*, 191 AD2d 589 [2d Dept. 1993]...................................................12

*People v. Simon*, 145 Misc 2d 518 [Crim Ct, New York County, 1989]....................................13

*People v. Stumpp*, 129 Misc 2d 703 [Suffolk Dist Ct, 1985]............................................13

*People v. Vogel*, 116 Misc 2d 332 [App Term, 2d Dept., 1982]............................................13

*Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 103 S. Ct. 948, 74 L. Ed. 2d 794 [1983]...........................................................................................20

*Quinoy v. Pena*, 2014 U.S. Dist. LEXIS 67016 (S.D.N.Y. May 14, 2014) ...............................18

*Rakas v. Illinois*, 439 U.S. 128; 99 S Ct 421; 58 L.Ed.2d 387 (1978)....................................3, 10

*Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 301 (2d Cir.1996) ....................................4

*Rivera-Powell v. N.Y. City Bd. of Elections*, 470 F.3d 458, 465 (2d Cir. 2006) ..........................9

*Robison v. Via*, 821 F.2d 913 (2d Cir. 1987).............................................................16

*Rodriguez v. City of New York,* 2015 U.S. Dist. LEXIS 51448 (S.D.N.Y. April 20, 2015) .........15

*Shamir v. City of New York*, 2014 U.S. Dist. LEXIS 97805 (S.D.N.Y. July 15, 2014)...............21

*Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 90-91 (1965)......................................12

*Silverman v. United States, 365 U.S. 505, 511 n.4* ......................................................10

*State v. Mooney*, 588 A.2d 145, 161 (Conn. 1991).......................................................11

*Swartz v. Insogna*, 704 F.3d 105, 112 (2d Cir. 2013)...................................................17

*Thimmesch v. City of New York*, 2013 U.S. Dist. LEXIS 53587 (S.D.N.Y. 2013) ....................14

*Thomason v. Jernigan,* 770 F. Supp. 1195, 1197 (E.D. Mich. 1991) ....................................6

*United for Peace & Justice*, 323 F.3d 175, 177 (2d Cir. 2003)...........................................20

*United States v Albertini*, 472 US 675, 689 [1985] ...................................................19

*US v. Nelson*, 500 Fed.Appx. 90, 93 (2d Cir. 2012) .....................................................15

*Venetian Casino Resort, L.L.C. v. Local Joint Exec. Bd.*, 257 F.3d 937, 945 (9th Cir. 2001) .6, 24

*Waller v. City of New York*, 933 N.Y.S.2d 541, 544 (N.Y. Sup. Ct. 2011)................21, 22, 23

*Ward v Rock Against Racism*, 491 US 781 [1989] ....................................................19

*Warren v. Fairfax County*, 196 F.3d 186, 190 (4th Cir.1999)...........................................24

*Washington v. County of Rockland*, 373 F.3d 310, 320 (2d Cir.2004) ...................................19

**Statutes**

City of New York Special Zoning Permit, CP-20222, No. 4, p.215 (March 20, 1968) ................5

F.R.C.P. 12 (b) (6)...........................................................................................2

N.Y. RPA LAW §§731-749 ...............................................................................9

N.Y. RPA LAW § 713 (10) ...............................................................................8

N.Y. RPA LAW § 853 ....................................................................................9

New York City Park Rules and Regulations §1-04(p).....................................................3

NY RPA LAW §235........................................................................................9

NYC Charter § 206(c)......................................................................................6

NYC Rules §§ 1-01(a), (m), (n); 2- 03(d)(2).............................................................6

NYC Zoning Resolution § 37-727 .......................................................................5, 20

NYPL §140.05..............................................................................................12

NYPL §195.05................................................................................................................12
U.S. Const. 4th Amend.......................................................................................................3

# I. INTRODUCTORY STATEMENT AND DEFINITION OF TERMS

This case is about the illegality of the midnight eviction of the Plaintiff demonstrators from their homes without a court order or an emergency.

It is not about the lawfulness of the Plaintiff demonstrators' residence in Zuccotti Park – although, pursuant to the city zoning code and legally-binding statements of city officials their camping was in fact lawful. The point is, once the Plaintiffs were in lawful residence in the Park, even if conditions there had gradually changed so it became necessary to remove them, at that point a court order was required. An eviction without a court order violated their due process rights under the 14th Amendment, and their reasonable-expectation-of-privacy rights under the 4th Amendment. Passive refusal to obey an unlawful eviction order was no crime.

Plaintiff Occupy Wall Street ("OWS") demonstrators who were lawfully residing in Zuccotti Park (the "Park") on the night of November 14-15, 2011, base this class action, brought principally against Defendant City of New York ("City"), on one legal issue, and on one factual issue. Legally, they assert that, absent an emergency, the City could not remove them from their lawful residence without a court order. Factually, they assert that there was no emergency, and there was no court order. The City defendants must concede the facts. Their legal arguments find no support under the law.

Plaintiffs assert that they were lawfully residing in the Park on November 15, 2011. Zoning laws provided for 24-hour use of the Park without limitation as to duration of stay, and both the Mayor and Police Commissioner had stated publicly that their residence in the Park in tents and bedrolls was lawful. No emergency legalized their subsequent midnight forcible removal on one hour's notice *without a court order*.

Defendants now, in this Motion for F.R.C.P. 12 (b) (6) Dismissal ("Motion"), for the first time, argue that Plaintiffs were squatters or licensees, subject to removal any time the Park's private owners chose.

They were not squatters or licensees. This is why, as the Complaint alleges, Defendants, after an interval of months in which to consider their legal options, relied on the pretext of an emergency, rather than claiming (prior to this motion), that Plaintiffs were mere squatters or licensees. Aside from making the meritless squatter/licensee argument referenced above, this motion to dismiss is a cut-and-paste job offering facts, arguments and authorities taken from other litigation, largely irrelevant to this action.[1]

## II.  STATEMENT OF FACTS

On November 15, 2014, Meyers et al. filed this action alleging that on November 15, 2011, Defendant City of New York, and the three responding individual employee government officials, former Mayor Michael Bloomberg, former NYPD Commissioner Raymond Kelly, and former NYPD Chief of Department Esposito, as part of a policy of violating constitutional rights, had evicted them from homes they had occupied for more than a month in Zuccotti Park (the "Park"), which was, furthermore, a "traditional public forum" subject to special 1st Amendment protection.  ¶¶1, 2, 16-19, 27, 30-33, 35, 40, 44, 56, 92, 94).  The eviction was a retaliation for Plaintiffs' 1st Amendment Activities during the prior 60 days.  Two of the individual defendants,

---

[1] Defendants have attached as their Exhibit B the transcript of closing arguments and ruling in a criminal matter, *People v. Bassolino*.  The arrest there did take place in Zuccotti Park, but involved no party to this action, is not incorporated into the Complaint, has little or nothing to do with this case and is referred to only in passing by Defendants themselves. The Exhibit may be stricken, pursuant to FRCP 12(b)(6)'s requirement that this motion be decided on the basis of the Complaint allegations, and to the Court's "inherent authority to strike any filed paper which it determines to be abusive or otherwise improper under the circumstances" *In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig*, 763 F. Supp. 2d 423, 581 (S.D.N.Y. 2011; or simply disregarded.  To the extent that it gives any hint of the Bassolino Court's reasoning, it is adverse to Defendants here:  the Court indicated that it would *not* convict simply on the basis that a police officer ordered Mr. Bassolino out of the Park and he disobeyed, as Defendants argue here. The Court required proof of some conduct by Mr. Bassolino that rendered the order to leave the Park lawful. Only after prosecutors satisfied that requirement did the Court find Mr. Bassolino guilty. Defendants' Exhibit B at 11:17-20 (seeking evidence he interfered with use of a park bench by others).

Bloomberg and Kelly, City Mayor and City Police Commissioner respectively, had previously assured Meyers et al. that they had a right to remain as they were, camping in the Park, and could not lawfully be removed. ¶30. Nevertheless, at about 1:00 AM in the early morning of November 15, 2011, acting on the orders of Bloomberg, Kelly, and Esposito, NYPD officers, including those named in this action, ordered Meyers et al. to leave their homes and cease their 1st Amendment activities in the Park or face arrest, and then, one hour later, arrested them. ¶¶1, 2, 16-19, 27, 30-33, 35, 40, 44, 56, 92, 94.

## III. DISCUSSION

a. The Eviction had to comply with Plaintiffs' rights under the 14th and 4th Amendments.
City's zoning laws and public statements created a 14th Amendment property right, and a 4th Amendment reasonable expectation of privacy, for Plaintiffs as they resided in the Park; thereafter, even if changed conditions might make their absence from the Park necessary, their forcible removal still had to comply with the 14th and 4th amendments. Complaint at ¶¶ 29, 30, 32, 34, 49; U.S. Const. 4th Amend; *Rakas v. Illinois*, 439 U.S. 128; 99 S Ct 421; 58 L.Ed.2d 387 (1978 *Katz v. U.S.* 389 U.S. 347, 351-52 (1967); U.S. Const. 14th Amend.; *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434 (1982); *Escalera v. New York City Housing Authority*, 425 F.2d 853 (2d Cir. 1970).

b. Defendants' Legally-Binding Public Statements. Defendant City, through Defendant former Mayor Bloomberg and former Police Commissioner Kelly, stated publicly that Plaintiffs, who were camping in the Park, were there lawfully and could not be removed. ¶ 30. Plaintiffs reasonably relied on those statements in continuing to camp in the Park. ¶¶34, 49. Defendants are estopped now from asserting in this action that Plaintiffs were *not* camping lawfully.[2]

---

[2] Plaintiffs note that camping in City-owned parks is lawful with a permit. New York City Park Rules and Regulations §1-04(p).

*Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 301 (2d Cir.1996) ("Equitable estoppel is imposed by law in the interest of fairness to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought."); see also *Ionosphere Clubs, Inc. v. Ins. Co. of PA (In re Ionosphere Clubs, Inc.)*, 85 F.3d 992, 999 (2d Cir.1996); *Nassau Trust v. Montrose Concrete Prod. Corp.*, 56 N.Y.2d 175, 451 N.Y.S.2d 663, 436 N.E.2d 1265,1269-70 (1982).

Furthermore, the City's zoning code created a right for Plaintiffs to be in the Park 24 hours a day, without stay duration limit, unless modified with *City* approval according to a defined due process procedure. Complaint at ¶¶ 29, 32. This made the Mayor a spokesperson for the entity in control of camping in the easement.

The Defendants' public statements also created a 4th Amendment reasonable expectation of privacy for the Plaintiffs as they continued to camp in the Park, which, again, the private owner could not extinguish. Complaint at ¶¶ 30, 34.

c. The actions of the policymaker Defendants support City's *Monell* liability. Plaintiffs allege that the City itself acted *directly* to evict plaintiffs. ¶¶ 1-3. The Complaint also alleges policymaker status for individual defendants: ¶17 (Bloomberg), ¶18 (Kelly), ¶19 (Esposito) ¶92-94, as they engaged in official, unconstitutional conduct. The complaint specifically alleges *direct conduct* by the City and the individual policymaker defendants on its behalf and as its representatives: ¶30 (public announcement creating easement, etc.); ¶31 (failure to obtain court order); 32 (failure to get Planning Commission approval); 33 (no notice); 44 (decisions and orders to evict and arrest). These allegations are all properly re-pleaded for the purposes of Plaintiffs' formal individual defendant, and municipal entity claims. ¶¶ 76, 80, 84, 90; *City of St.*

*Louis v. Praprotnik*, 485 U.S. 112, 123 (1988); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482-85 (1989).

Defendants' cut-and-paste *Monell* arguments from other cases overlook the basis for municipal liability in *this* action. To the extent that defendants' arguments might apply to street-level officers, none have yet been located and served ; they are not parties to this Motion; and the arguments on their behalf are pointless.

d.  City's zoning code created a constitutionally-protected easement for 24-hour use of the Park without a stay duration limit.  Since 1961, New York City has encouraged the development of hundreds of Privately-Owned Public Spaces ("POPS") like Zuccotti Park across the five boroughs.  These spaces are created by granting zoning incentives to the private developers of office and residential buildings in exchange for the creation of spaces that are legally required to be open and accessible to the public. City of New York Special Zoning Permit, CP-20222, No. 4, p.215 (March 20, 1968) (requiring Zuccotti Park to be a "permanent open park" for the "public benefit"); NYC Zoning Resolution § 37-727 (requiring that "public plazas [such as the Park] shall be accessible to the public at all times, except where the CPC [City Planning Commission] has authorized a nighttime closing.").

City zoning law vests the CPC with the sole authority to authorize restrictions to public access, and mandates compliance with procedural safeguards before it can approve any restrictions. A private owner seeking to restrict the hours of public access must first submit documentation of the alleged "significant operational or safety issues" underlying the request. *See* NYC Zoning Resolution § 37-727. The CPC is statutorily precluded from authorizing any closing of a POPS unless the private owner provides documented evidence of "significant" safety issues and the CPC determines, based on the submitted evidence, that the closure is

"necessary for public safety . . . as documented by the applicant." *See id.* A request by a private owner to restrict access is scheduled for a public hearing, and anyone wishing to speak about the proposed modification is permitted to do so at the hearing or to submit written comments. *See* NYC Rules §§ 1-01(a), (m), (n); 2- 03(d)(2). The borough president and community board affected by the proposed changes are also given notice and the opportunity to comment, *see* NYC Charter § 206(c). Thus, the City's review-and-approval control over any limits on 24-hour use of the Park rendered the nonparty private owner powerless to extinguish or alter the rights created by the Defendants' public statements.

Numerous courts have recognized that when privately owned land is explicitly dedicated to public use, the space is a traditional public forum regardless of who holds title to the property. *See, e.g., Venetian Casino Resort, L.L.C. v. Local Joint Exec. Bd.*, 257 F.3d 937, 945 (9th Cir. 2001) (holding that where private property owner agreed to construct sidewalk "dedicated to public use" in exchange for ability to widen road when constructing new casino, the privately-owned section of sidewalk constituted a traditional public forum); *Thomason v. Jernigan,* 770 F. Supp. 1195, 1197 (E.D. Mich. 1991) (holding that privately-owned driveway with easement for public access was a traditional public forum); *Citizens To End Animal Suffering And Exploitation, Inc. v. Faneuil Hall Marketplace, Inc.*, 745 F. Supp. 65 (D. Mass. 1990) (holding that pedestrian lanes inside a marketplace owned by the City of Boston but leased for 99 years by a private company constituted public forum because, *inter alia,* the City retained an easement protecting "the public's access and passage"); *see also Hague v. CIO*, 307 U.S. 496, 515 (1939) (opinion of Roberts, J.) ("Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public."); *First Unitarian Church of Salt Lake City v. Salt Lake City Corp.,* 308 F.3d 1114,

1123 (10th Cir. 2002) ("Because such traditional public fora are often easements, it is evident the property here is not exempt from the First Amendment merely because it is an easement rather than land to which the government holds fee title") (citation omitted) (holding that privately-owned street that contained a public easement was "infused with public purposes" and thus a traditional public forum.

POPS are akin to "an easement held by the public on the owner's property." As spaces legally mandated to be open and accessible for the public's benefit and use, POPS are subject to constitutional protections as traditional public fora under the First Amendment. Indeed, courts have acknowledged that when a space is explicitly designated for public use, like a POPS, it is clear that such areas are "inherently compatible" with First Amendment activity and subject to constitutional protections as traditional public fora. *See ACLU of Nevada v. City of Las Vegas*, 333 F.3d 1092, 1101 (9th Cir. 2003) ("[W]hen a property is used for open public access . . . we need not expressly consider the compatibility of expressive activity because these uses are inherently compatible with such activity") (holding that privately-owned pedestrian mall was traditional public forum).

This corroborated the Defendants' statements and provided additional legal support for Plaintiffs' 14th Amendment property and 4th Amendment reasonable expectation of privacy rights when engaged in their 1st Amendment activity of remaining physically present in the Park.

e. Plaintiffs' 14th Amendment property rights entitled them to some degree of Due Process prior to an eviction. *Engblom v. Carey*, 677 F.2d 957, 964 (2d. Cir. 1982) (recognizing an occupant's "tenancy-type" interest, established other than by a lease, and entitled to protection under the 14th Amendment). See also, *Escalera v. New York City Housing Authority*, 425 F.2d 853 (2d Cir. 1970).

Thus, even if Plaintiffs had violated an enforceable Park rule, Due Process protection of their previously-recognized property interest is not thereby eliminated. See *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434 (1982) ("[T]he State may not finally destroy a property interest without first giving the putative owner an opportunity to present his claim of entitlement."); *Escalera v. New York City Housing Authority*, 425 F.2d 853 (2d Cir. 1970) (denying 12(b)(6) dismissal of class action, alleging failure to provide public housing occupants with adequate due process, prior to eviction, on the basis of Housing Authority allegations that their continued occupancy had become unlawful).

> f. Because Defendants had an ample opportunity to obtain a court order, 14th

Amendment Due Process required a prior hearing. Complaint at §§2, 3, 25, 26, 30, 36, 38; Motion at 5 ("growing health and safety concerns"), 6 ("mounting health and safety issues"). "The requirements of due process are inherently flexible, and turn on an analysis of the private and government interests involved in each particular situation. *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S. Ct. 893, 902, 47 L. Ed. 2d 18 (1976)." *Engblom*, id. at 964, citing *Mathews* and *Parratt v. Taylor*, 451 U.S. 527, 539, 101 S. Ct. 1908, 1915, 68 L. Ed. 2d 420 (1981). *Engblom* cites *Paratt* for the well-known rule of law that "the necessity of quick action by the State or the impracticality of providing any meaningful predeprivation process can, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, satisfy the requirements of procedural due process." Here, by contrast, *there was no emergency*, thus no necessity of quick action, and nothing impracticable about providing meaningful predeprivation process. NY law specifically provided a procedure that the Park's private owner could have used to obtain a court's agreement that plaintiffs' occupancy was unlawful and must end: N.Y. RPA. LAW § 713 (10) (permitting special

summary proceeding, without 10-day notice to quit, to recover possession of real property where no landlord-tenant relationship exists); §§731-749 (procedure for service and filing of petition, trial, judgment, warrant).

There is no basis to be found in the Complaint's allegations, or from any other judicially-noticeable source, for a claim that a midnight eviction on one hour's notice would still have been required because of expected resistance from plaintiffs. OWS demonstrators, including plaintiffs, had no history of defying any court order.

Because the eviction was authorized, predictable, and anticipated by Defendants, Defendants *cannot raise a defense based on post-deprivation remedies*. Complaint at ¶¶ 24-27, 38, 49; *Alexandre v. Cortes*, 140 F.3d 406, 411 (2d Cir. 1998); *Rivera-Powell v. N.Y. City Bd. of Elections*, 470 F.3d 458, 465 (2d Cir. 2006); *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 880 (2d Cir. 1996); *Pelt v. City of New York*, 2013 U.S. Dist. LEXIS 122848, *41 (E.D.N.Y. 2013) (whose citations to the cases above have been omitted by Defendants).

Defendants assert that NY RPA LAW §235 does not apply specifically to Plaintiffs. Plaintiffs, though "occupants" [id. at 235-f (1)(b)], were not dealing with a "landlord" [id. at 235-f (2)]. The section recognizes in principle the right to a state damages action, arising from interference with a lawful residence by someone claiming a superior property interest [id. at 235-f (9)]. See also, N.Y. RPA LAW § 853 ("If a person is disseized, ejected, or put out of real property in a forcible or unlawful manner, or, after he has been put out, is held and kept out by force or by putting him in fear of personal violence or by unlawful means, he is entitled to recover treble damages in an action therefor against the wrong-doer.")

g.  Plaintiffs' 4th Amendment reasonable expectation of privacy made eviction from their homes without a warrant unlawful.  The 4th Amendment provides special protection for the privacy of a residence, with a specific warrant requirement for search or seizure there.  See, e.g., *Rakas v. Illinois*, 439 U.S. 128; 99 S Ct 421; 58 L.Ed.2d 387 (1978).  *Rakas* and the cases cited therein thus suggest two relevant points: first, an overall reasonable expectation of privacy—not the existence (or the lack) of a property right—controls the 4th amendment analysis.  "What a person knowingly exposes to the public, even in his home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."  *Katz v. U.S.* 389 U.S. 347, 351-52 (1967).  According to the *Katz* Court, whether the government has violated an individual's rights under the fourth amendment depends on whether it has "violated the privacy upon which [the individual] justifiably relied." Id. at 353.

When determining whether an expectation of privacy is  reasonable, "we must keep in mind that the test of legitimacy is . . .  whether the government's intrusion infringes upon the personal and societal  values protected by the Fourth Amendment." *California v. Ciraolo*,  476 U.S. 207, 212 (1986) (quotation omitted). In *Silverman v. United  States*, the Court explained the "very core" of the Fourth Amendment:  A man can still control a small part of his environment, his  house; he can retreat thence from outsiders, secure in the knowledge  that they cannot get at him without disobeying the Constitution.  That is still a sizable hunk of liberty—worth protecting from  encroachment. A sane, decent, civilized society must provide  some such oasis, some shelter from public scrutiny, some insulated  enclosure, some enclave, some inviolate place which is a  man's castle.  365 U.S. 505, 511 n.4 (1961) (quoting United States v. On Lee, 193 F.2d  306, 315-16 (2d Cir. 1951) (Frank, J., dissenting).  See generally *State v. Mooney*, 588

A.2d 145, 161 (Conn. 1991) ("The interior of [the homeless defendant's duffel bag and cardboard box] represented, in effect, the defendant's last shred of privacy from the prying eyes of outsiders, including the police. Our notions of custom and civility, and our code of values, would include some measure of respect for that shred of privacy, and would recognize its assertion as reasonable under the circumstances of this case.")

h. Defendants' Surprise "Squatter/Licensee" Argument. No court or party appears ever to have made this claim about OWS and Zuccotti Park. Defendants did not make it in their Pre-Filing Letter Motion. Defendants cite to no facts in the Complaint that might dispute Plaintiffs 4th and 14th Amendment rights to reside in the Park. Defendants' citation to facts which *might also be consistent with* being licensees (e.g., Plaintiffs' physical presence in the Park), cannot substitute for proof that they *were* licensees.

Furthermore, Defendants' repeated assertions, that they intended only to remove Plaintiffs briefly, contradict their claim that Plaintiffs were squatters. E.g, Motion at p. 15: "a brief general prohibition on entry or remaining in Zuccotti Park. … [a] short term closure of the park"; at 16 ("plaintiffs merely had to exit the park while it was cleaned for several hours") It is not plausible to argue that Park owners would *permit squatters to return to residing on their property*. They likewise strain credulity when they claim that the owners wanted OWS, who were supposedly mere licensees, to return and continue blocking maintenance of the Park and precluding its use by the general public, after a brief interval.

i. Defendants' "Retro" 1950s-Era Legal Doctrine Purporting to Once Again Criminalize Passive Disobedience of Unlawful Orders from a Private Owner or Cooperating Police. This line of defense is like an early episode of the "Mad Men" television program, resurrecting a time in the 1950s when any private owner's complaint, or police officer's barked command, was

deemed sufficient to legalize rounding up disobedient protesters and jailing them. A decade of 1960s landmark US Supreme court civil rights cases, and their federal and state progeny, such as *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983) and *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 90-91 (1965) bar these arguments. No reasonable officer, much less the Mayor of New York City, could claim to be unaware of or confused about these bedrock legal principles.

New York's NYPL §140.05 (criminal trespass in space open to the public requires a *lawful* order to leave – "A person who, regardless of his intent, enters or remains in or upon premises which are at the time open to the public does so with license and privilege unless he defies a *lawful* order not to enter or remain) (emphasis added); *People v. Leonard* 62 N.Y.2d 404 (1984) (reversing conviction for Trespass where defendant was ordered by security to leave a state university area that was "open to the public", because "the accused is presumed to have a license and privilege to be present"); see also *Arum v. Miller*, 273 F.Supp.2d 229, 235 (EDNY 2003) (refusing to find trespass arrest valid simply because school administrator filled out trespass complaint for police); NYPL §240.20 (6) (disorderly conduct requires lawful dispersal order).

Despite the vague statutory wording cited by Defendants, under NYPL §195.05 (Obstruction of Governmental Administration, "OGA") the official function being performed must be one that was "authorized by law." *In re Verna C.*, 531 N.Y.S.2d 344, 345 (2d Dep't 1988); *Lennon v. Miller*, 66 F.3d 416 (2nd Cir. 1995) (granting qualified immunity to officers who arrested plaintiff who refused order to exit vehicle during marital dispute, after plaintiff's spouse had shown police documents proving ownership of the vehicle, "New York courts have further held that the official function being performed must be one that was '*authorized by law*'); (Emphasis added); *People v. Lupinacci*, 191 AD2d 589 [2d Dept. 1993], *People v. Vogel*, 116

Misc 2d 332 [App Term, 2d Dept., 1982], *People v. Joseph*, 156 Misc 2d 192 [Crim Ct, Kings County, 1992], *People v. Simon*, 145 Misc 2d 518 [Crim Ct, New York County, 1989], *People v. Stumpp*, 129 Misc 2d 703 [Suffolk Dist Ct, 1985]).

Defendants misleadingly cite isolated language from cases in purported support of Defendants' "retro" principle that passive disobedience of *any* police command, lawful or unlawful, is criminal OGA, but whose facts and/or holdings fail to support that unconstitutional principle: *Brown v. City of New York*, 13cv1018 [2014 U.S. Dist. LEXIS 83513 (S.D.N.Y. 2014)] (holding that where defendants were intimidating Starbucks employees and refused to leave the area, "[r]efusing to obey orders to leave the premises *can* be the basis for an arrest for obstructing governmental administration.") (emphasis added); *Marcavage v. City of New York*, 689 F.3d 98 (2nd Cir. 2012) (valid OGA arrest of anti-abortion protesters during Republican National Convention who refused to leave "no-demonstration" zone established at Madison Square Garden, which Court specifically found satisfied the 1st Amendment traditional public forum doctrine and therefore specifically found the dispersal order *was lawful*); *Johnson v. City of New York*, 5cv7519 [2008 U.S. Dist. LEXIS 78984 (S.D.N.Y. 2008)] (finding OGA arrest lawful of defendant who refused to get up from couch and cooperate in arrest on harassment charges, which Court specifically found supported by probable cause because of undisputed evidence that domestic partner had made half a dozen 9-1-1 calls and police could see caller had minor injuries).

Defendants cite to isolated language from a number of lower-court criminal trespass cases, which Defendants assert support criminalizing continued presence, on property open to the public, solely because the private owner orders someone to leave. The holdings and/or facts of these cases fail to provide the needed support for Defendants' "retro" principle. None concern

the principal issues in this case, i.e., estoppel, easement, 14th Amendment Due Process, 4th Amendment reasonable expectation of privacy in lawful residence, lack of hearing or emergency. *Matthes v. East Fishkill*, 785 F.2d 43 (2nd Cir. 1986) (affirming valid arrest based on plaintiff's refusal to leave a town planning board's *closed* session, instead following the board members when they tried moving to another location; "one who defies a *lawful* order to leave premises 'remains unlawfully' within the meaning of penal law", no discussion of §140.05(5), which governs trespass in an area open to the public); *Thimmesch v. City of New York*, 2013 U.S. Dist. LEXIS 53587 (S.D.N.Y. 2013) (finding trespass arrest valid of Park demonstrator 4 months after arrest of Plaintiffs here, apparently on basis that the Park was at that time no longer open to the public [no discussion of §140.05 (5)], holding that "In the specific case of Zuccotti Park because of its status as privately-owned property, when one is ordered to leave by police and does not, such conduct *can* comprise a trespass") (emphasis added); *Lebowitz v. City of New York*, 2014 U.S. Dist. LEXIS 25515, *9 (S.D.N.Y. 2014) (dismissing false arrest claim, where a confusing Park rule, prohibiting lying down "which" interfered with Park use, could have been understood to include mere surplusage, thus justifying otherwise unlawful trespass arrest); *Faruki v. City of New York*, 517 Fed.Appx. 1, 2013 U.S. App. LEXIS 2619 (2d Cir. 2013) (non-precedential summary order) (questioned on other grounds in *Oxman v. Downs*, 999 F.Supp.2d 404 (EDNY 2014) (affirming 12(b)(6) dismissal of false arrest claim by customer at furniture store, apparently in non-public area [no discussion of §140.05(5)], who kept arguing with proprietor and refused to leave even after police were called); *Berger v. Schmitt*, 91 Fed.Appx. 189 (2nd Cir. 2004) (non-precedential summary order) (affirming summary judgment finding valid arrest based on plaintiff's refusal to obey an order to leave an apparently private [no discussion of §140.05(5)] parking lot when police were investigating a fight, instead repeatedly approaching

the officer and store patrons involved in the fight, seeking to obtain information about how to contact them; *Rodriguez v. City of New York,* 2015 U.S. Dist. LEXIS 51448 (S.D.N.Y. April 20, 2015) (finding valid arrest of employee who refuses order to leave his place of employment when ordered to do so by his employer in officer's presence; "The only relevant question is whether a police officer, having witnessed Rodriguez being asked to leave by a superior officer, could reasonably conclude that Rodriguez lacked a license to remain on the premises. As such a belief is reasonable, probable cause existed for Rodriguez's arrest.")

Likewise, Defendants' one cited Disorderly Conduct/ Failure to Disperse case fails to support "retro" criminalization for passively disobeying an officer's order without some arrestee conduct making the dispersal order *lawful*: *US v. Nelson*, 500 Fed.Appx. 90, 93 (2d Cir. 2012) (summary order). The case *includes* the isolated language Defendants' seek to rely on, taken from a 1932 New York case, *People v. Galpern*, 259 N.Y. 279 (1932) – however, the 2nd Circuit specifically *declines* to endorse that language, holding that the facts showed that the arrestees' *conduct* made the dispersal order *lawful*:

> Quoting language drawn from *People v. Galpern*, 259 N.Y. 279 (1932), the district court ruled that "[u]nder New York's disorderly conduct statute, an order to disperse is lawful unless 'the order was "purely arbitrary" and "not calculated in any way to promote the public order."'" *Nelson*, 2011 WL 1327332, at *3 (quoting *Crenshaw v. City of Mount Vernon*, 372 F. App'x 202, 206 (2d Cir. 2010) (summary order) (quoting *Galpern*, 259 N.Y. at 284-85)). Nelson argues that this standard no longer passes constitutional muster because, after the New York Court of Appeals decided *Galpern* in 1932, multiple Supreme Court cases held that loitering laws are unconstitutional to the extent that they "encourage arbitrary and discriminatory enforcement" and fail to provide "minimal guidelines to govern law enforcement." [Footnote omitted.] See *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983); see also *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 90-91 (1965) (noting that law permitting arrest based on "the moment-to-moment opinion of a policeman on his beat . . . bears the hallmark of a police state"). In light of these cases, he contends that the standard employed by the district court provides too much deference to police officers. We need not decide the proper standard for assessing the legality of dispersal orders, as the undisputed facts establish that the officer's dispersal order here served an important end.

Nelson and his companions were indisputably blocking the only cleared pathway, forcing customers to walk on the snow and ice in order to enter the market and thus creating a safety risk. Accordingly, because the dispersal order served an important purpose and because the other statutory requirements were satisfied, we cannot conclude that the dispersal order was unlawful.

j. There was no uncertainty about the Park's "hybrid status", or any other basis for Qualified Immunity. To begin with, Defendants' claim to qualified immunity on behalf of Defendant City has no basis in the law. *Owen v. City of Independence*, 445 U.S. 622, 657 (1980).

As to the purported uncertainty: Rights recognized by the statute and case law authority cited above, including those concerning the elements of criminal trespass in a space open to the public, cannot be rendered novel or "uncertain" by a defense attorney's inventive label three years after the event.[3] And, where, as here, the right at issue is clearly established, pretrial dismissal on qualified immunity is appropriate only if "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right. *Robison v. Via*, 821 F.2d 913 (2d Cir. 1987) *citing Halperin v. Kissinger*, 807 F.2d 180, 189 (D.C.Cir. 1986) (Scalia, J., sitting by designation); see also *Cerrone v. Brown*, 246 F.3d 194, 203 (2d Cir. 2001) ("the only conclusion a reasonable jury could reach is that reasonable officers would disagree on the constitutionality" of the official's actions.

---

[3] An easement is not a hybrid property status. Its parameters may be disputed, but that does not make it "hybrid." An online search discloses that "hybrid status" as to property means a real estate investment strategy combining "flipping" and "buy and hold" plans, or, in Virginia, to property that is both marital and separate. The term was recently proposed for use in a 2015 Yale Law Journal student note to mean "regimes that impose different property rules at different points in space or time" ("Against the Tide: Connecticut Oystering, Hybrid Property, and the Survival of the Commons," Vol. 124 No. 4) but has not been adopted. The easement at issue in this case was fixed as to both space and time.

Defendants' "uncertainty" argument, to the extent it purports to rely on state or federal lower court rulings interpreting the criminal statutes and zoning provisions at issue, is weakened, in part because they are largely mis-cited, and in part because they are only lower court rulings. *Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 433–34 (2d Cir. 2010) (recognizing that the court "may examine statutory or administrative provisions in conjunction with prevailing circuit or Supreme Court law to determine whether an individual had fair warning that his or her behavior would violate the victim's constitutional rights" [citing *Hope v. Pelzer*, 536 U.S. 730, 741– 45) (2002)]).

Defendants' qualified immunity argument at pp. 10-12 is notable for its omission to cite to any paragraph of the Complaint, fact in the record, or court decision that might be the basis for doubt or uncertainty about the Park's so-called "hybrid status". This sketchy qualified immunity claim seems intended more as a basis for interlocutory appeal than for Complaint dismissal.[4]

In any event, as explained above, Plaintiffs' forcible removal required a court order, or an emergency, neither of which the City had. What Defendants did have was individual City officials, who now assert, in pursuit of qualified immunity, that they might have reasonably believed, after months of consideration, and despite their own public statements to the contrary, that a midnight eviction of plaintiffs from their beds, carrying what they could in their arms, without even a summary hearing, was lawful.

No reasonable officer could have contemplated such an action without thinking, "This is wrong."

k.  Plaintiffs' Malicious Prosecution claim is properly pleaded.  *Swartz v. Insogna*, 704 F.3d 105, 112 (2d Cir. 2013) (required elements of claim); Complaint at ¶¶ 47, 48, 53, 84-89

---

[4] Defendants add a footnoted argument about officers' qualified immunity based on taking orders from superior officers. Motion at FN 2. Here, the responding Defendants are the superior officers. Defendants' argument applies to some other case.

(alleging all claim elements). There is no way of knowing from Defendants' Motion, any more than there was from their Pre-Filing Letter Motion, how this pleading is arguably deficient. Their cited authority is no help – there, after citing the general pleading rules on which Defendants purport to rely, the Court held that the Malicious Prosecution claim survived a motion to dismiss. *Quinoy v. Pena*, 2014 U.S. Dist. LEXIS 67016 (S.D.N.Y. May 14, 2014).

l.  Defendants acted in retaliation against Plaintiffs' 1st Amendment activities.  Plaintiffs specifically plead facts supporting a First Amendment retaliation claim at ¶¶ 47, 51, 53, of the Complaint, and properly replead them at the outset of their First Amendment Cause of Action, at ¶76.

 "In order to state a retaliation claim, we require a private citizen to show: "(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right." *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)." (1) and (2) are specifically pleaded; Complaint at ¶¶ 23-26, 39, 40, 41, 48, 51-53; (3) may be established by (a) proximity in time between the protected speech and the government action, here 60 days at most, which is adequate proximity; and by (b) use of a pretext by the government, here, its pretextual claim of a fire or health emergency.  Complaint ¶¶ 1, 2, 3, 23-27, 49, 2, 3, 25, 26, 30, 36, 38, *Mullin v. Gettinger*, 450 F.3d 280, 285-286 (7th Cir. 2006); *Blue v. Koren*, 72 F3d 1075, 1084 (2d Cir. 1995) (evidence of improper motive in 1st Amendment retaliation case may include direct or circumstantial facts).

The proximity in time (Complaint at ¶49) between Plaintiffs' 1st Amendment activities and Defendants' unlawful eviction order plausibly supports retaliation.  Also, given the timing of the eviction in mid-November, and Defendants' announcement that a rule against the use of tents

and bedrolls would be strictly and absolutely enforced when demonstrators returned, it is plausible to infer that the City action was really intended to end Plaintiffs' expressive presence in the Park once and for all, not just to enable a brief cleanup.

Defendants can cite no authority to support an argument that retaliation is lawful so long as the punishment is inflicted at a time when the speaker's speech has paused. There is no such "window of opportunity" for 1st Amendment retaliation. Nor is there a "courage" penalty for speakers who stand up to retaliation and go on speaking. The 1st Amendment protects against government action that "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights," *Washington v. County of Rockland*, 373 F.3d 310, 320 (2d Cir.2004). No proof of *actual* deterrence is required.

m. Enforcement of the private owner's broad rule prohibiting any structure to be erected in a traditional public forum violated the 1st Amendment. In a traditional public forum, time, place, and manner restrictions must be narrowly-tailored to a governmental need. The rules need not be the least restrictive or intrusive available (*Ward v Rock Against Racism*, 491 US 781 [1989]) and need only "promote[ ] a substantial government interest that would be achieved less effectively" absent the rule (*United States v Albertini*, 472 US 675, 689 [1985]), but, ultimately, a limitation of 1st amendment activity in a traditional public forum is lawful only if it serves a significant government interest and is "narrowly tailored to serve that governmental interest, … targets and eliminates no more than the exact source of the 'evil' it seeks to remedy") *Frisby v. Schultz*, 487 U.S. 474, 484-88 (1988). The government's need for maintenance and access to the Park did not justify a prohibition of, e.g., well-spaced tents that were taken down for cleaning and blocked access no more than trees, benches, tables, or other structures erected in the Park. The due process hearing that Defendants failed to afford the Plaintiffs would have resulted in a

zoning regulation modification, or a court order, accommodating both the government's needs, and the Plaintiffs' rights.  Enforcement of a rule particularly directed at tents and sleeping bags was clearly aimed at altering the Park's 24-hour availability. This was a limitation that required and did not obtain City Planning Commission and City Council consideration and approval, and its enforcement was aimed at terminating "Occupy Wall Street's" symbolic 24 hour presence in the Park through an unlawful order and the abuse of police authority.  NYC Zoning Resolution § 37-727.

Even a content-neutral limitation serving a significant government interest must provide an ample alternative form of communication.  (*Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 103 S. Ct. 948, 74 L. Ed. 2d 794 [1983]). Here, no reasonable alternative means of expression was made available. This is not a case about *proximity to* an audience or to a significant event as in Defendants' cited cases, Continued residence in *this Park was* the significant event.  Complaint at ¶23.

Even if continuing activities in nearby streets could have provided the needed alternative, as Defendants assert, Defendants' did not make it available by directing Plaintiffs there, as the government did in, e.g., *United for Peace & Justice*, 323 F.3d 175, 177 (2d Cir. 2003) (granting permit for specific location two blocks from UN), and cannot claim such an alternative on the basis of an attorney's argument now.  There was no reason for Plaintiffs to believe that if they had begun protesting on the adjacent sidewalk, as Defendants implausibly now suggest, that they would not have immediately been ordered to disperse from there, as well.  See, e.g., *Brown v. City of New York*, 13cv1018 [2014 U.S. Dist. LEXIS 83513 (S.D.N.Y. 2014)] (persons evicted from Zuccotti Park arrested for refusing to leave the vicinity of a nearby Starbucks restaurant).

Defendants' enforcement of an overbroad rule was aimed at terminating that community and message – not at the purported government interest. This is not a case like *Shamir*, where the visitor was unlawfully camped in a different, City-owned park, to make arrival in time for a protest more convenient. *Shamir v. City of New York*, 2014 U.S. Dist. LEXIS 97805 (S.D.N.Y. July 15, 2014) (finding arrest valid of Plaintiff who was sleeping in City Hall Park in violation of rules *only* applicable to City Hall Park, *not* to Zuccotti Park, and Plaintiff having sworn that he was *not* engaged in 1st Amendment activity by doing so.)

Defendants erroneously state that two lower courts reconciled the rights of Park protesters and the Park's private owner. They did not. *Waller* and *Nunez* are persuasive authority, but whose persuasiveness is undermined by the quality of their reasoning. *Waller v. City of New York*, 933 N.Y.S.2d 541, 544 (N.Y. Sup. Ct. 2011); *People v Nunez*, 36 Misc. 3d 172 (N.Y. City Crim. Ct. 2012). *Waller* assumes the Park was a traditional public forum, but fails to engage in the erroneously-attributed tailoring analysis of the owner's blanket prohibitions to the protesters' freedom of speech, i.e., it makes *absolutely* no concession to the 1st Amendment rights of demonstrators. The broad prohibition against any structure being erected would henceforth preclude tents, regardless of how many or how few; how arranged; whether removed during cleaning activities; etc. By ignoring the law's tailoring requirements, *Waller* failed to reach the accommodation the 1st Amendment required between speech and government interest.

*Nunez*, on which Defendants also seek to rely, is also a lower court decision, which adopts the earlier *Waller* ruling endorsing the owner's blanket prohibition, again without *any* concession to the demonstrators, that is, without reconciling government interest with 1st Amendment speech, as Defendants erroneously state.

In *Nunez*, furthermore, the 1st Amendment discussion is the outcome of a pre-trial motion to dismiss a criminal complaint, where all the government's facts are assumed true; all inferences are drawn in favor of the government; in the context of an argument that the complaint's allegations are insufficient as a matter of law.

Neither *Waller* nor *Nunez* find, as Defendants erroneously attribute to them, that OWS had precluded use of the park by the general public – *Waller* finds only that the owner's rules, because they were consistent with enabling such use in safety, were reasonable. There is no finding that demonstrators had created any health or fire hazard or interfered with anyone else's use of the Park – only that the Park's owners were responsible for preventing such things, and could use rules to do so.

*Waller* also held that OWS had no 1st Amendment right to prevent use by others – but OWS hadn't claimed to. There is no discussion of whether anything *less* than the owner's blanket rule might *also* enable such use by the general public, while at the same time accommodating the demonstrators' 1st Amendment rights. Nor is there any consideration of the fact that, in the month of November, absolutely outlawing the use of tents in any manner would put a definite end to the symbolic OWS Park residence that had captured so much of the world's attention.

*Nunez* was not in a posture to make any findings of fact – it simply assumed the facts of the criminal complaint – but also does not make the attributed finding of fact that OWS had precluded use of the Park by the general public.

Neither case considered, as Defendants also erroneously attribute to them, the lawfulness of the eviction. Neither court upheld the clearing of the Park as lawful, as Defendants also

erroneously assert. Neither court even *considered* these issues, which were *not relevant to the proceedings before them*.

Waller was an action by an OWS demonstrator brought the day after the eviction seeking prospective relief: an injunction against future enforcement of the Park rules in any manner. It was not a claim for damages based on the prior *unlawful* rule enforcement, i.e., the removal or arrests; and consequently did not address the lawfulness of the eviction or of clearing the Park without a hearing, as Defendants erroneously assert.

*Nunez* simply followed *Waller* in finding that the criminal complaint could not be dismissed, because there might have been a lawful basis for ordering the *Nunez* criminal defendant to leave the Park, assuming all of the criminal complaint's facts to be true.

However, *Nunez* also noted, again assuming true all of the government's facts and drawing all inferences in favor of the government, that, given the reasonable belief the criminal defendant could have had in the lawfulness of his presence in the Park in light of the law making it a public space 24 hours a day, the prosecution might have difficulty in proving the criminal Trespass *mens rea* element of knowingly unlawful presence in the Park. Id. at 183.[5] This reasoning supports the claim of Plaintiffs here that they had a reasonable expectation of privacy in their Park residence.

n. The Park was a Traditional Public Forum. As explained above, easements like the Park are commonly recognized as Traditional Public Forums ("TPF"). Particular characteristics further establish that the Park was a TPF. A TPF determination will be based on the forum's physical characteristics and the context of the property's use, including its location and purpose,

---

[5] The court did *not* find, as erroneously attributed by Defendants, that there was reasonable cause to believe that the defendant was guilty as charged. Only that the prosecution could proceed on the basis of the allegations of the criminal complaint. The existence at any time of reasonable cause to believe the charges were in fact true was not an issue before the court. This was not, e.g., a suppression motion.

as well as whether the property in question "is part of a class of property which by history or tradition has been open and used for expressive activity." *Hotel Employees v. City of New York Department of Parks & Recreation,* 311 F.3d 534 (2d Cir. 2002); *Warren v. Fairfax County*, 196 F.3d 186, 190 (4th Cir.1999); *Venetian Casino Resort, L.L.C. v. Local Joint Exec. Bd.*, 257 F.3d 937, 943 (9th Cir.2001), cert. denied, 535 U.S. 905, 122 S.Ct. 1204, 152 L.Ed.2d 142 (2002). By these standards, as alleged in the Complaint, the Park was a TPF. Complaint at ¶¶ 40, 5, 24, 25, 26, 29, 30, 32.

This court may take judicial notice that, historically, Zuccotti Park was, inter alia, the location of the first coffeehouse in colonial New York City, The King's Arms, where, on November 5, 1773, summoned by the Sons of Liberty, a huge crowd assembled outside the coffee house to denounce the Tea Act, and agents of the East India Trading company who were handling cargoes of dutied tea. It was perhaps the first public demonstration in opposition to the Tea Act in the American colonies. The location was renovated after damage following the 9/11 attacks and became a popular destination for tourists visiting Ground Zero.

These historical and geographic facts about Zuccotti Park, coupled with the decision to zone it as a space, open to the public at all times despite private ownership, "similar to a public park", as well as public statements by City officials that the resident OWS demonstrators had a legal right to remain to continue their 1st Amendment activities, establish that free expression in the Park was not incompatible with its intended or historic use.

No pleaded fact, or other fact in the record, supports Defendants' assertion that Zuccotti Park was anything other than a traditional public forum.

## IV.  CONCLUSION

For the above-stated reasons and each of them, the Court should deny the Motion, or grant leave to Plaintiffs to amend their Complaint.

Dated: May 13, 2015                                      Respectfully submitted,

/S/

PAUL L. MILLS
LAW OFFICE OF PAUL L. MILLS
Park West Finance Branch
P.O. 20141
New York, NY 10025