UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

Charles Meyers et al.,

                       **Plaintiffs,**

         -against-

City of New York et al.,

                     **Defendants.**

--------------------------------------------------------------x

**1:14-cv-9142 (ALC)**

**OPINION & ORDER**

ANDREW L. CARTER, JR., United States District Judge:

## I. INTRODUCTION

In the fall of 2011, plaintiffs Charles Meyers, John Baker, Justin Strekal, and Miles Walsh traveled to New York City's Financial District to participate in a burgeoning demonstration in Zuccotti Park, a privately owned plaza. Joining dozens of others, they pitched tents and unrolled sleeping bags in the plaza, staying overnight and eventually maintaining a weeks-long, uninterrupted presence. They claimed their extended stay was an act of political protest and named their movement after its unorthodox methods: Occupy Wall Street.

On November 15, 2011, Meyers and his fellow demonstrators were arrested after refusing to comply with New York Police Department orders to vacate Zuccotti Park. Two years later, the demonstrators brought this class action complaint under 42 U.S.C. § 1983 against the former mayor, police chief, and police commissioner of New York City, as well as the individual officers who arrested them (collectively with the municipal defendant City of New York, "the City"). They accuse the City of violating their constitutional rights by evicting them from their homes in Zuccotti Park without a warrant, notice, or an opportunity to be heard and by subjecting them to unlawful arrest, imprisonment, and malicious prosecution in retaliation for engaging in

political speech. The City moves to dismiss all claims. For the reasons discussed below, the motion to dismiss is granted in part and denied in part.

## II. BACKGROUND

The Occupy Wall Street ("OWS") movement gained international attention as an open-air forum addressing government policies on corporate interests and income inequality. Complaint ¶ 25. The movement's name derived from the "occupation" by dozens of demonstrators of Zuccotti Park, a privately owned plaza in downtown Manhattan's Financial District. Id. ¶ 24. Over the course of weeks, demonstrators maintained a continuous physical presence in the plaza, erecting tents and other living structures, including a kitchen and library. Id. ¶ 25. They intended to use those structures as homes for an indefinite period of time. Id. ¶ 49.

During their occupation of Zuccotti Park, the demonstrators displayed art, performed dance and music, and engaged in protests and discussion. Id. ¶ 26. Using both the physical occupation itself and related displays and discourses, the group intended to convey a "message of protest against government collusion in corporate gain at the expense of humanity and values dear to civilized culture." Id. They directed that message at both local and global observers, who either walked directly past the plaza or viewed video and images of it via television and Internet broadcasts. Id.

When the occupation began, the demonstrators were in compliance with Zuccotti Park rules that mandated 24-hour public access. Id. ¶ 29. Further, former New York City mayor Michael Bloomberg and former New York Police Department ("NYPD") Commissioner Raymond Kelly publicly announced that the OWS demonstrators' continued camping in Zuccotti Park was permissible. Id. ¶ 30. But at some point after the occupation began and prior to the

demonstrators' arrests, the City and the park's private owners modified or suspended the rules mandating 24-hour public access, specifically to evict the OWS demonstrators. Id. ¶ 32.[1]

At around 1:00 a.m. on November 15, 2011, NYPD officers speaking via bullhorn ordered the demonstrators to leave the park. Id. ¶ 42. Drawing all reasonable inferences in Meyers's favor, the officers did not inform the demonstrators of changes to Zuccotti Park's rules, instead simply ordering evacuation without explanation. Id. At the same time, the officers were aware that the demonstrators honestly believed that they had a legal right to remain in Zuccotti Park, relying on the park's former rules mandating public access and the mayor and commissioner's previous public statements that their camping was permissible. Id. ¶ 34. Further, because of the late hour in which the bullhorn announcement was made, there was no person in the area who could have been annoyed by the demonstrators' conduct, other than the police themselves. Id. ¶ 36.

About an hour after ordering the demonstrators to leave the park, NYPD officers forcefully removed and arrested them. Id. ¶ 43. They did so under direct orders of Mayor Bloomberg, Commissioner Kelly, and Chief Esposito. Id. ¶ 44. Afterward, the City claimed that

---

[1] Meyers claims that any changes to the rules required ex-ante approval of the New York City Planning Commission, pursuant to agreement between the City and the park's private owners. Complaint ¶ 32. Although the complaint could be read to allege the existence of a private agreement between the City and Zuccotti Park's private owners, Meyers's briefing refers exclusively to New York City zoning laws as the source of the Planning Commission approval requirement. Brief in opposition, at 5-7. The Complaint's reference to an "agreement" between the City and the park's owners is thus most plausibly read to refer to the zoning laws Meyers identifies. As the Court explains in its analysis, the applicability of those zoning laws to Zuccotti Park is an unsupported legal conclusion rather than a factual allegation. "Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotations removed). Therefore, for the purposes of this motion to dismiss, the Court declines to accept as true Meyers's legal conclusion that modifications to the Zuccotti Park rules required ex-ante approval of the New York City Planning Commission.

a fire hazard justified the emergency evacuation, though no emergency conditions actually existed in the park. Id. ¶¶ 2-3, 44. The City did not provide the OWS demonstrators notice or an opportunity to be heard prior to evicting them. Id. ¶ 33.

The evicted demonstrators were arrested for trespass under New York Penal Law (NYPL) § 140.05 and disorderly conduct under NYPL § 240.20. Id. ¶¶ 34, 37. Immediately following arrest, they were held in NYPD custody for over an hour. Id. ¶ 46. The City filed criminal charges against the arrestees, forcing them to return to court for one or more appearances or to remain subject to court authority to do so during a period of months. Id. ¶ 47, 87. All of the charges were eventually dismissed. Id.

## III.  DISCUSSION

### A.  The Court has jurisdiction.

The City does not dispute jurisdiction and the Court finds it exists under 28 U.S.C. § 1331, because Meyers alleges a federal question, and 28 U.S.C. § 1343, because Meyers alleges a deprivation of civil rights.

### B.  Legal standard for a motion to dismiss

To survive a motion to dismiss under Fed.R.Civ.P. 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009). On a motion to dismiss, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in the plaintiff's favor. Harris v. Mills, 572 F.3d 66, 71 (2d Cir.2009). But to satisfy Rule 12(b)(6), a plaintiff must offer "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will

not do." Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir.2010). Ultimately, on a motion to dismiss "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Walker v. Schult, 717 F.3d 119, 124 (2d Cir. 2013) (internal quotations and citation omitted).

### C. Analysis

Meyers brings suit under 42 U.S.C. § 1983, which allows a plaintiff to sue a government official for the alleged deprivation of constitutional rights. As a matter of legal pleading, Meyers claims that under the First Amendment, unspecified rules governing Zuccotti Park were unconstitutional time, place, and manner restrictions. Under both the First and Fourth Amendments, he claims that the City evicted, arrested, imprisoned, and prosecuted the OWS demonstrators without probable cause and in retaliation for engaging in protected speech. Under the Fourth and Fourteenth Amendments, he claims that by forcibly evicting the demonstrators from their homes in Zuccotti Park without notice and opportunity to be heard, the City violated their reasonable expectations of privacy and their rights to procedural due process. Finally, he claims that policymaking officials of the City of New York acted directly to violate the OWS demonstrators' constitutional rights, thus incurring municipal liability under Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 664 (1978).

When Meyers's complaint is read with all reasonable inferences in his favor, it alleges that the OWS demonstrators took up residence in Zuccotti Park as a form of political protest, fully in compliance with park rules mandating 24-hour public access. City officials originally condoned the demonstrators' actions, but then grew annoyed with their continued presence in Zuccotti Park as global media brought increasing scrutiny to the OWS movement. So they changed the park rules in order to evict the demonstrators without first notifying them or seeking

required approval from the New York City Planning Commission. Deliberately choosing not to notify the demonstrators of the change, city officials then arrested them, in part for violating those rules. Afterward, to cover their malfeasance, officials fabricated a fire-related emergency in the park to justify eviction of the demonstrators.

As currently pleaded, Meyers's complaint does not fully bear out all of his theories. Below, the Court explains in detail why it reaches that conclusion.

> 1. **Meyers fails to state a claim for violation of procedural due process under the Fourteenth Amendment.**

Meyers claims that the demonstrators' eviction from Zuccotti Park without notice or opportunity to be heard violated their Fourteenth Amendment rights to procedural due process. "The Due Process Clause of the Fourteenth Amendment provides that no State shall 'deprive any person of life, liberty, or property, without due process of law.'" Tenenbaum v. Williams, 193 F.3d 581, 592 (2d Cir. 1999) (quoting U.S. Const. amend. XIV § 1). "To plead a violation of procedural due process, a plaintiff must plausibly allege that he was deprived of property without constitutionally adequate pre- or post-deprivation process." J.S. v. T'Kach, 714 F.3d 99, 105 (2d Cir. 2013) (citing Ahlers v. Rabinowitz, 684 F.3d 53, 62 (2d Cir.2012)). "The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property'. . . ." Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 59 (1999). "Such property interests cannot be found on the face of the Constitution, but rather 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits.'" Looney v. Black, 702 F.3d 701, 706 (2d Cir. 2012) (citing Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972)).

The property interested identified by Meyers is an alleged easement granting continuous public access to Zuccotti Park. "An easement is an *interest in land* created by grant or agreement, express or implied, which confers a right upon the holder thereof to some profit, benefit, dominion, enjoyment or lawful use out of or over the estate of another." Copertino v. Ward, 100 A.D.2d 565, 567 (2d. Dep't 1984) (emphasis in original). In New York, "in order to establish an express easement, 'there must be a writing containing plain and direct language evincing the grantor's intent to create a right in the nature of an easement rather than a revocable license.'" Devine v. Vill. of Port Jefferson, 849 F. Supp. 185, 188 (E.D.N.Y. 1994) (citing Willow Tex, Inc. v. Dimacopoulos, 510 N.Y.S.2d 543, 544 (1986)). "In order to establish an easement by implication, the following four elements must be present:

> (1) the relevant parcels of land must have once been in unitary ownership; (2) a use must have been established in which one part or parcel of the land was subordinated to another; (3) the use must be plainly and physically apparent by reasonable inspection; and (4) the use must affect the value of the estate benefitted and it must be necessary to the reasonable use of such estate."

Id. at 188-89 (citing United States v. O'Connell, 496 F.2d 1329, 1333 (2d Cir. 1974)). An easement by estoppel, a type of implied easement, may exist "where a person has changed his position with relation to, or expended money upon, his property, relying upon an existing easement in the adjoining property, and without which the act done or the expenditure would have been useless, and the adjoining owner has not interposed to forbid or prevent it." Olin v. Kingsbury, 181 A.D. 348, 355 (1st Dep't 1918). The New York Court of Appeals instructs that the doctrine of equitable estoppel "should be applied with great caution when dealing with realty." Huggins v. Castle Estates, Inc., 36 N.Y.2d 427, 433 (1975) (citing Lyon v. Morgan, 143 N.Y. 505 (1894)).

Zoning regulations do not ordinarily create an easement, either express or implied, because "[t]he use that may be made of land under a zoning ordinance and the use of the same land under an easement or restrictive covenant are, as a general rule, separate and distinct matters, the ordinance being a legislative enactment and the easement or covenant a matter of private agreement." Friends of Shawangunks, Inc. v. Knowlton, 64 N.Y.2d 387, 392 (1985). That being said, "a parcel of property may become a park by express provisions in a deed *or legislative enactment* or by implied acts, such as the continued use of the parcel as a park." Angiolillo v. Town of Greenburgh, 735 N.Y.S.2d 66, 73 (2d Dep't 2001) (emphasis added); see also Hotel Employees & Rest. Employees Union v. City of New York Dep't of Parks & Recreation, 311 F.3d 534, 548-49 (2d Cir. 2002) (finding that Lincoln Center Plaza had not been dedicated as a public park). "[A]bsent a formal dedication, an implied dedication of park land may exist 'when a municipality's acts and declarations manifest a present, fixed, and unequivocal intent to dedicate[,]'" or, conversely, accept a dedication from a private owner. Id. at 548 (Sotomayor, J.) (citing Riverview Partners, L.P. v. City of Peekskill, 273 A.D.2d 455 (2d Dep't 2000); Winston v. Vill. of Scarsdale, 170 A.D.2d 672, 673 (2d Dep't 1991) (stating the elements necessary to establish a dedication as "an offer by an owner, either express or implied, to appropriate land or some interest or easement therein to public use and an acceptance of such offer, either express or implied, when acceptance is required, by the public") (internal quotations and alterations omitted). Even where a public easement exists in a private owner's land, if the use proposed by the member of the public "is outside the scope of the public easement, then the consent of the owner of the soil is necessary . . . ." Eels v. Am. Tel. & Tel. Co., 143 N.Y. 133, 136 (1894) (permitting eviction of telephone line poles erected on a privately owned public highway where the public's easement was for passage only); Holden v. City of New York, 7

N.Y.2d 840, 841 (1959) ("The reservation of a mere 'right of way' . . . included only the right of passage over the surface of the land.").

Meyers identifies two discrete sources of state law-rules or understandings that created the easement he claims exists: public statements by the mayor and police commissioner condoning the OWS demonstrators' continued camping in Zuccotti Park and New York City zoning regulations. Meyers does not allege the existence of an implied dedication or acceptance of Zuccotti Park for public use.

Assuming, without deciding, that a public official's oral statement could even qualify as a "state law-rule[] or understanding" that establishes a property interest, the statements here did not. Plainly, the mayor and commissioner's statements were made orally rather than in writing, and thus could not create an express easement.

Nor do the mayor and police commissioner's alleged public statements that camping in Zuccotti Park was permissible suffice to establish an implied easement. The first element of an implied easement requires that the easement grantor and holder's property originally be in unitary ownership. Meyers has alleged that Zuccotti Park is privately owned. Complaint ¶ 32. He does not allege that the City ever held title to Zuccotti Park. The nonowner mayor or police commissioner therefore lacked the legal authority to grant an implied easement in Zuccotti Park. As to the more specific claim of an implied easement by estoppel, the cases Meyers cites to in support of this argument address only general principles of equitable estoppel. See e.g. Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 301 (2d Cir. 1996). To the extent Meyers argues that equitable estoppel precludes the City from denying in this litigation that the mayor and police commissioner publicly condoned camping in Zuccotti Park, his argument is unnecessary at the motion to dismiss stage, where the Court assumes the truth of that factual allegation. But even if

that allegation is true, it fails to rebut case law that limits the creation of easements by estoppel to actions or statements of a property owner. See e.g. Kohman v. Rochambeau Realty & Dev. Corp., 17 A.D.3d 151, 157 (1st Dep't 2005); Bd. of Managers of Atrium Condo. v. W. 79th St. Corp., 2 A.D.3d 246, 248 (1st Dep't 2003); Karlin v. Bridges, 172 A.D.2d 644, 646 (2d Dep't 1991). Accordingly, no easement in Zuccotti Park, either express or implied, was created by public statements of the nonowner mayor or police commissioner.

Meyers also argues that a public easement was created in Zuccotti Park by N.Y.C. Zoning Resolution § 37-727, which states that "[a]ll public plazas shall be accessible to the public at all times, except where the City Planning Commission has authorized a nighttime closing, pursuant to the provisions of this Section." A "public plaza" is defined as "an open area for public use provided in accordance with the requirements set forth in Section 37-70, inclusive." N.Y.C. Zoning Resol. § 12-10. Section 37-70 further defines a public plaza as an "open area[] on a zoning lot intended for public use and enjoyment." A "zoning lot" is in turn defined as either a lot of record or tract of land subject to specific, variable conditions of ownership, all of which are irrelevant for purposes of this immediate inquiry. N.Y.C. Zoning Resol. § 12-10.

However, because the Court lacks evidence of the applicability of § 37-727 to Zuccotti Park, it does not address the question of whether that section creates an easement for public use. By its plain language, § 37-727 applies only to "public plazas." Meyers fails to allege that Zuccotti Park is a public plaza as defined by the zoning resolutions, or, better yet, attach proof of its designation as such.[2] Meyers thus fails to

---

[2] Meyers does cite to a New York Special Zoning Permit, CP-20222, issued on March 20, 1968, for the proposition that Zuccotti Park is one of a class of hundreds of properties throughout New York City designated as "privately owned public spaces" ("POPS"). That permit is not attached as evidence, nor has

plausibly allege that the zoning regulations he cites created an express easement for the public.

Because Meyers fails to plead that the OWS demonstrators possessed a property interest in Zuccotti Park, his claim for violation of procedural due process must be dismissed.

### 2. Meyers states a claim for false arrest or imprisonment under the Fourth Amendment.

"Under the Fourth Amendment, made applicable to the States by the Fourteenth Amendment, the people are 'to be secure in their persons . . . against unreasonable searches and seizures . . . .'" Maryland v. Pringle, 540 U.S. 366, 369 (2003) (quoting U.S. Const. amend. IV.). "A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, . . . is substantially the same as a claim for false arrest under New York law." Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) (internal citation removed). "The common law tort of false arrest is a species of false imprisonment, an action 'derived from the ancient common-law action of trespass [that] protects the personal interest of freedom from restraint of movement.'" Singer v. Fulton Cnty. Sheriff, 63 F.3d 110, 118 (2d Cir. 1995) (citing Broughton v. State, 37 N.Y.2d 451, 456 (1975)). "The right against false imprisonment in the criminal prosecution context extends only to pre-trial detention, rendering false arrest and false imprisonment synonymous." Mitchell v. Home, 377 F. Supp. 2d 361, 371 n.3 (S.D.N.Y. 2005).

To state a claim of false arrest or imprisonment, a plaintiff must allege that "(1) the defendant intended to confine him [or her], (2) the plaintiff was conscious of the confinement,

---

the Court found a judicially noticeable record of it. Accordingly, it is not considered on this motion to dismiss.

(3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." Sinagra v. City of New York, 127 A.D.3d 729, 730, 7 N.Y.S.3d 286, 288 (2d. Dep't 2015) (citing Broughton, 37 N.Y.2d at 456). The only element disputed here is whether the confinement was privileged, in that the demonstrators' arrests were supported by probable cause. "A Fourth Amendment claim turns on whether probable cause existed to arrest for any crime, not whether probable cause existed with respect to each individual charge." Marcavage v. City of New York, 689 F.3d 98, 109 (2d Cir. 2012). "Probable cause exists where the facts and circumstances within . . . the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." Id. Thus, if on the facts alleged, the arresting officers had knowledge and reasonably trustworthy information that the demonstrators were committing a criminal offense, Meyers's Fourth Amendment claim fails as a matter of law.

### i. On the facts alleged, probable cause to arrest for a crime did not exist.

The City argues that probable cause existed for three offenses: trespass, disorderly conduct, and obstructing governmental administration. On the limited factual record currently alleged, the Court disagrees.

### 1. Trespass

Trespass under NYPL § 140.05 occurs when a person "knowingly enters or remains unlawfully in or upon premises." "[A] person who enters upon premises accidentally, or who honestly believes that he is licensed or privileged to enter, is not guilty of any degree of criminal trespass." People v. Basch, 36 N.Y.2d 154, 159 (1975).

The City considers it indisputable that the owners of Zuccotti Park informed the OWS demonstrators that their license to enter and remain had been revoked, citing People v. Nunez, 36 Misc. 3d 172, 178 (N.Y. Crim. Ct. 2012). Nunez denied an OWS demonstrator's motion to dismiss for facial insufficiency charges of trespass, disorderly conduct, and obstructing governmental administration stemming from his arrest on the morning at issue in this case. The City thus invokes Nunez in an attempt to establish that, as a matter of law, probable cause existed for the arrest of all OWS demonstrators on the morning of November 15, 2011. For several reasons, Nunez does not support so sweeping a proposition.

First, Nunez did not address whether probable cause existed for the defendant's arrest. Instead it found merely that the criminal information lodged in that case "contain[ed] nonhearsay factual allegations which, if true, 'establish . . . every element of the offense charged and the defendant's commission thereof.'" Id. at 174 (citing N.Y. Crim. Proc. 100.40(1)(c).

Second, even if Nunez had found probable cause for that defendant's trespass arrest, long-established case law holds that "*[a]fter the fact* judicial participation cannot validate an unlawful arrest; only probable cause existing at the time of arrest will validate the arrest and relieve the defendant of liability." Blasini v. City of New York, 2011 WL 6224605, at *4 (S.D.N.Y. Dec. 14, 2011) (citing Broughton, 37 N.Y.2d at 456) (emphasis in original). Any after-the-fact finding of probable cause as to a particular defendant's arrest alone thus would not control whether probable cause existed to arrest Meyers and his fellow plaintiffs.

Third, Nunez was a criminal matter that considered the facts alleged by the City in support of the defendant's arrest "in the light most favorable to the People." Nunez, 36 Misc. 3d at 174. That is the opposite of the Court's task here, which is to assess this complaint for legal sufficiency while assuming the *arrestees'* factual allegations as true. Finally, when a court is

asked to take notice of a judicial opinion, it does so "only to establish the existence of the opinion, not for the truth of the facts asserted in the opinion." Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 157 (2d Cir. 2006).

The City's citation to other courts within this district considering charges of trespass in Zuccotti Park are also distinguishable. Lebowitz v. City of New York, 2014 WL 772349 (S.D.N.Y. Feb. 25, 2014) aff'd, 606 F. App'x 17 (2d Cir. 2015), granted summary judgment dismissal of a false arrest claim stemming from a trespass in Zuccotti Park on a different date than the one at issue here. Id. at *3. The Lebowitz court also reached its judgment on the basis of a developed record, where the facts showed that the arrestees were well aware that their permission to be in Zuccotti Park had been withdrawn. Id. Thimmesch v. City of New York, 2013 WL 1558699 (S.D.N.Y. Apr. 9, 2013) is similarly inapposite, as it addressed probable cause for an arrest in Zuccotti Park months after the arrests at issue here, on a different set of alleged facts. The Second Circuit is clear that "the existence of probable cause must be determined with reference to the facts of each case." Manganiello v. City of New York, 612 F.3d 149, 161 (2d Cir. 2010). References to other facts from other cases are therefore insufficient to establish probable cause in this one.

Finally, the City argues that the demonstrators' mistaken belief that they had permission to remain in Zuccotti Park is insufficient to defeat a finding of probable cause, citing to Rodriguez v. City of New York, 2015 WL 1780158 (S.D.N.Y. Apr. 20, 2015). Rodriguez found probable cause to arrest for trespass where officers observed a duly authorized official revoke the defendant's license to remain on the premises. The state appellate court reversed the defendant's conviction for trespass, finding that notwithstanding the order to leave, "it was nonetheless reasonable, under the facts and circumstances established, for defendant to conclude that he had

a license or privilege to remain on the premises." <u>People v. Rodriguez</u>, 42 Misc. 3d 142(A) (2d Dep't 2014). In that case, probable cause to arrest existed because the arresting officers had a reasonable belief that the defendant *knew* his privilege to remain had been revoked. In contrast, Meyers alleges that the officers here were certain that the OWS demonstrators did not know their privilege had been revoked.

Whether Meyers's allegations are borne out by a factual record remains to be seen. But as currently pleaded, the OWS demonstrators entered the Zuccotti Park in compliance with the private owners' rules granting 24-hour access. <u>Complaint</u> ¶ 29. The owners then modified or suspended the rules to evict the demonstrators. <u>Id.</u> ¶ 32. At all times, including after the change of rules, the demonstrators honestly believed that the original park rules were still in force, a belief possible only if no one told them that they were not. <u>Id.</u> ¶¶ 29, 34. An officer of reasonable caution, aware that the Park's former rules allowed for 24-hour access and that the sudden suspension of the rules had not been conveyed to the demonstrators, could not reasonably believe that they "knowingly enter[ed] or remain[ed] unlawfully" in Zuccotti Park. N.Y. Penal Law § 140.05. The officers therefore lacked probable cause to arrest for trespass.

### 2.  Disorderly conduct

The City also argues that probable cause existed to arrest the OWS demonstrators for disorderly conduct under N.Y. Penal Law § 240.20(6). That subsection makes it a crime to "congregate[] with other persons in a public place and refuse[] to comply with a lawful order of the police to disperse" when undertaken "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof." Again attempting to supplement the factual record, the City generally references dangerous inconveniences to the public in Zuccotti Park and growing health and safety concerns caused by the OWS demonstrators. It also cites to <u>Nunez</u> to

establish the presence of gas and combustible materials in Zuccotti Park. People v. Nunez, 36 Misc. 3d at 180.

As stated above, Nunez's factual record, itself comprised simply of allegations by the City viewed in the light most favorable to the City, cannot supplement the record on this motion to dismiss. Rather, on this case's current record, no member of the public besides the police, the demonstrators, and interested journalists was present in the vicinity of Zuccotti Park at one in the morning. Complaint ¶ 36. No reasonable officer could therefore have concluded that the demonstrators had an intent to cause public inconvenience, annoyance, or alarm, nor that they were recklessly creating a risk of such. Probable cause to arrest for disorderly conduct was thus lacking.

### 3.   Obstructing Governmental Administration

"A person is guilty of obstructing governmental administration when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function." N.Y. Penal Law § 195.05. "New York courts have further held that the official function being performed must be one that was 'authorized by law.'" Lennon v. Miller, 66 F.3d 416, 424 (2d Cir. 1995) (citing In re Verna C., 531 N.Y.S.2d 344, 345 (2d Dep't 1988)).

The City contends that the OWS demonstrators interfered with its ability to address problematic, mounting health and safety issues in Zuccotti Park. Any such issues are absent from the current record, so probable cause to arrest for impeding the City's response to them was lacking.

Separately, the City argues that the OWS demonstrators prevented officers from carrying out an unspecified police operation in the park. From the cases the City cites in support of that

argument, all of which dealt with an officer's lawful order to vacate an area, the operation in question appears to be the eviction of OWS demonstrators from Zuccotti Park. See e.g. Lennon v. Miller, 66 F.3d at 424; Brown v. City of New York, 2014 WL 2767232, at *7 (S.D.N.Y. June 18, 2014); C.G. v. City of New York, 2013 WL 5774291, at *6 (E.D.N.Y. Oct. 24, 2013); Marcavage v. City of New York, 2010 WL 3910355, at *10 (S.D.N.Y. Sept. 29, 2010) aff'd, 689 F.3d 98 (2d Cir. 2012); Johnson v. City of New York, 2008 WL 4450270, at *10 (S.D.N.Y. Sept. 29, 2008). All of the cases cited by the City were decided on summary judgment, with the benefit of a factual record indicating that the police orders given were lawful. Here, Meyers alleges that the NYPD order was unlawful in that it was given in the absence of any illegal activity or conditions. Complaint ¶¶ 2, 32. Thus, on the current factual record, no reasonable officer could believe that the order to evacuate was lawful and probable cause to arrest for obstruction of governmental administration was lacking.

In sum, on the facts currently alleged, the officers lacked probable cause to arrest for trespass, disorderly conduct, or obstruction of governmental administration. Accordingly, Meyers states a § 1983 claim in violation of the demonstrators' Fourth Amendment rights to be free of false arrest or imprisonment.

### 3. Meyers states a claim for Fourth Amendment malicious prosecution.

A § 1983 claim of malicious prosecution in violation of the Fourth Amendment must "establish the elements of a malicious prosecution claim under state law." Fulton v. Robinson, 289 F.3d 188, 195 (2d Cir. 2002). In New York, to plead malicious prosecution, a plaintiff must allege: "(1) that the defendant commenced or continued a criminal proceeding against him; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding; and (4) that the proceeding was instituted with malice." Kinzer v. Jackson,

316 F.3d 139, 143 (2d Cir. 2003). Finally, "[i]n order to allege a cause of action for malicious prosecution *under § 1983*, [a plaintiff] must assert, in addition to the elements of malicious prosecution under state law, that there was (5) a sufficient post-arraignment liberty restraint [ie. a seizure] to implicate the plaintiff's Fourth Amendment rights." Rohman v. New York City Transit Auth. (NYCTA), 215 F.3d 208, 215 (2d Cir. 2000) (emphasis in original). "[A] post-arraignment defendant who is obligated to appear in court in connection with [criminal] charges whenever his attendance [i]s required suffers a Fourth Amendment deprivation of liberty." Swartz v. Insogna, 704 F.3d 105, 112 (2d Cir. 2013) (internal quotations removed).

The City first argues that because probable cause existed for the OWS demonstrators' arrests, it existed for their prosecution. "The probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases." Stansbury v. Wertman, 721 F.3d 84, 95 (2d Cir. 2013). "Probable cause, in the context of malicious prosecution, has also been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." Id. Because the Court has already concluded that on the facts alleged probable cause to arrest did not exist, the City fails to clear the slightly higher hurdle of establishing probable cause for prosecution.

The City also argues that Meyers has not specified the charges filed nor pleaded specific involvement by any defendant, including specific false statements or speakers. Both arguments are without merit. Meyers repeatedly references both trespass and disorderly conduct as the crimes for which he and the other demonstrators were arrested and charged. Id. ¶¶ 34, 37-38. The City is indeed correct that "[i]t is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Farid v. Ellen, 593 F.3d 233, 249 (2d Cir. 2010) (quoting Wright v. Smith, 21 F.3d 496,

501 (2d Cir.1994)). But Meyers has alleged that the mayor, police chief, and commissioner personally and jointly ordered the OWS demonstrators' arrests and prosecutions out of disagreement with their political message, or at the very least, the manner in which it was expressed. Complaint ¶¶ 44, 48.

Nor does a § 1983 pleading require the level of particularity demanded by the City. Compare Fed. R. Civ. P. 8(2) (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief") with Fed. R. Civ. P. 9(b) (requiring a party to "state with particularity the circumstances constituting fraud or mistake"). Rather, only a plausible claim supported by factual content is necessary. Under ordinary circumstances, the commencement of criminal proceedings would most plausibly be attributed solely to the arresting officer that submitted a police report to the prosecutor. But reading Meyers's complaint as a whole, and drawing all reasonable inferences in his favor, he alleges that the individual high-level defendants collaborated with the officers to file knowingly false charges against the OWS demonstrators. This conclusion is supported by allegations that the high-level defendants grew frustrated with the demonstrators' continued presence in Zuccotti Park as increasing scrutiny from worldwide media coverage drew attention to their complaints. Id. ¶¶ 26, 48. The individual defendants then manufactured a post-hoc fire hazard justification, in the absence of an actual fire-related emergency, to cover up their malfeasance. Id. ¶¶ 2-3. Assuming these allegations are true, the Court concludes that the malicious prosecution claim is properly pleaded as to all defendants.

### 4.  Meyers fails to state a claim for eviction without a warrant under the Fourth Amendment.

Meyers also claims that the Fourth Amendment required NYPD officers to obtain a warrant before evicting the OWS demonstrators from their homes in Zuccotti Park.

> The Fourth Amendment embodies this centuries-old principle of respect for the privacy of the home: "The right of the people to be secure in their persons, *houses,* papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Wilson v. Layne, 526 U.S. 603, 610 (1999) (quoting U.S. Const. amend. IV (emphasis added)).

Notwithstanding, it remains true that "[t]he first step in any [§ 1983] claim is to identify the specific constitutional right allegedly infringed." Albright v. Oliver, 510 U.S. 266, 271 (1994). The Fourth Amendment protects against unreasonable searches and seizures alone. Meyers leaves unclear whether his claim of an unlawful eviction refers to an unreasonable search of a home or an unreasonable seizure of its inhabitants. In either event, and assuming without deciding that the structures and sleeping bags inhabited by OWS demonstrators were homes for the purposes of the Fourth Amendment, Meyers fails to allege any facts to support that the structures were searched or that their inhabitants were seized while in their homes. See e.g. Corsini v. Brodsky, 2015 WL 3456781, at *5 (S.D.N.Y. May 27, 2015) ("Plaintiff alleges that his Fourth Amendment rights to freedom from unreasonable seizure and search were violated by the . . . 'siege' of his apartment. This claim fails because he has pleaded neither a seizure nor a search.). While "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," Payton v. New York, 445 U.S. 573, 585 (1980), Meyers does not allege that any officer entered a structure inhabited by an OWS demonstrator. Accordingly, Meyers's claim of violation of the Fourth Amendment for eviction without a warrant is dismissed.

### 5.  Meyers states a claim for First Amendment retaliation.

"The First Amendment, applicable to the States through the Fourteenth Amendment, provides that 'Congress shall make no law . . . abridging the freedom of speech.'" Virginia v.

Black, 538 U.S. 343, 358 (2003) (quoting U.S. Const. amend. I). "In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws." Friedl v. City of New York, 210 F.3d 79, 85 (2d Cir. 2000). To state a claim for First Amendment retaliation, "a plaintiff must show: (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by [plaintiff's] exercise of that right; and (3) the defendant's actions caused him some injury." Smith v. Campbell, 782 F.3d 93, 100 (2d Cir. 2015) (quoting Dorsett v. County of Nassau, 732 F.3d 157, 160 (2d Cir.2013)).

As to the second and third elements of Meyers's retaliation claim, the Court finds them adequately alleged. Recently, the Second Circuit found the elements of a First Amendment retaliation claim properly alleged where a highway patrol officer issued tickets to a plaintiff hours after she had complained of his behavior to the officer's supervisor. Smith v. Campbell, 782 F.3d 93, 100 (2d Cir. 2015). The officer's "appearance at [the plaintiff's] house to deliver the tickets mere hours later was sufficiently proximate to imply that the issuance of the tickets was motivated by [the plaintiff's] complaint, and . . . issuance of the tickets was an injury in that it subjected her to a state action requiring that she either appear in court, pay a fine, or both." Id. Meyers alleges that NYPD officers arrested him and his fellow demonstrators while they were engaged in First Amendment speech, Complaint ¶ 39, even more proximate than the "mere hours later" identified in Smith. Their concurrent arrests thus imply a motivation substantially caused by that speech. As for injury, subsequent to their arrests the OWS demonstrators were subjected to a state action requiring their court appearances. Id. ¶ 89. The Complaint thus properly alleges motivation and injury.

Whether Meyers and the OWS demonstrators were engaged in First Amendment speech requires a more extended discussion.

### i.  As alleged, the OWS demonstrators were engaged in First Amendment speech.

"The [First] Amendment embodies and encourages our national commitment to robust political debate by protecting both free speech and associational rights." Jones v. Parmley, 465 F.3d 46, 56 (2d Cir. 2006) (Sotomayor, J.) (internal quotations and citations removed). Political demonstrations and protests are "activities at the heart of what the Bill of Rights was designed to safeguard." Id. The City disputes that the OWS demonstrators were engaged in First Amendment speech solely by virtue of their continued physical presence in Zuccotti Park. But the OWS demonstrators allege that apart from the occupation of Zuccotti Park, they were also engaged in "protest, discussion, performance, and displays of art" that expressed a message of "protest against government collusion in corporate gain . . . ." Complaint ¶¶ 25-26. The City offers no argument that these activities were anything but "classically political speech" operating at "the core of the First Amendment." Boos v. Barry, 485 U.S. 312, 318 (1988). Accordingly, Meyers has adequately alleged that the OWS demonstrators were engaged in First Amendment speech at the time of their arrests. See Occupy Columbia v. Haley, 738 F.3d 107, 120 (4th Cir. 2013) (finding an adequate pleading of a First Amendment violation on the basis of protesting and petitioning the government even if the right to indefinitely occupy a space does not implicate the First Amendment).

### ii.  As alleged, the OWS demonstrators were engaged in First Amendment expressive conduct.

The speech comprehended by the First Amendment includes both verbal communication and "symbolic or expressive conduct." Virginia v. Black, 538 U.S. at 358. Such an expansive

definition does not mean, however, that a "'limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea.'" Church of Am. Knights v. Kerik, 356 F.3d 197, 205 (2d Cir. 2004) (quoting United States v. O'Brien, 391 U.S. 367, 376 (1968)). Instead, there exists a line between criminal conduct the government may lawfully proscribe and expressive conduct entitled to constitutional protection. To draw that line, courts ask whether conduct was performed with "'[a]n intent to convey a particularized message . . . and [whether] the likelihood was great that the message would be understood by those who viewed it.'" Kerik, 356 F.3d at 205 (citing Texas v. Johnson, 491 U.S. 397, 404 (1989) (quoting Spence v. Washington, 418 U.S. 405, 410-11 (1974)). The party seeking First Amendment protection bears the burden of pleading that its actions qualify as expressive conduct. Kerik, 356 F.3d at 205 (citing Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 n. 5 (1984)).

   The City argues that courts within the Southern District have already found that an OWS demonstrator's refusal to leave a park does not constitute expressive conduct, citing Shamir v. City of New York, 2014 WL 4291851 (S.D.N.Y. Aug. 27, 2014) rev'd in part, Shamir v. City of New York, 2015 WL 6214708 (2d Cir. Oct. 22, 2015). Shamir found a police officer entitled to qualified immunity where he had arrested an OWS demonstrator for sleeping in City Hall Park without a permit. Id. at *1-2. But the Shamir court declined to engage in a First Amendment analysis of the officer's actions because Shamir's "sworn intention was not to engage in protest by sleeping in the park, but rather, to sleep in the park so he would not be late for a protest rally the next morning." Id. at *1. That admission made clear that "on the facts of this case" Shamir's conduct "was anything but" expressive. Id. at *2. In contrast, plaintiffs in this case plead that their "continued, collective physical presence in the Park" was intended as a message of political

protest against government collusion with corporate gain. Complaint at ¶ 26. Thus, Shamir is inapposite to the case at hand.

The City also attempts to impose an additional requirement to the Spence test for expressive conduct: whether the conduct at issue was "inseparably intertwined with a particularized message." Young v. New York City Transit Auth., 903 F.2d 146, 153 (2d Cir. 1990) (internal quotations removed). Young used that phrase to discuss whether begging in the New York City subway system would be understood by onlookers to carry a clear message. But the Young court expressly disclaimed the idea that its holding addressed "an ontological distinction between speech and conduct," id. at 154, relegating its discussion on expressive conduct to dicta. Loper v. New York City Police Dep't, 766 F. Supp. 1280, 1283 (S.D.N.Y. 1991).

At any rate, even if Young were to impose a higher standard than Spence for expressive conduct, that standard is met here. Young contrasted begging in the subway with cases in which there was "little doubt from the circumstances of the conduct that it formed a clear and particularized political or social message very much understood by those who viewed it . . . ." Young, 903 F.2d at 153. One of those cases involved "conducting a silent sit-in by black persons against a library's segregation policy." Id. (citing Brown v. Louisiana, 383 U.S. 131, 141–42 (1966)). As with Brown's sit-in, the circumstances of the conduct in this case leave little doubt that physically occupying Zuccotti Park formed part of a clear and particularized political message understood by both the passerby and global observers who viewed it. The demonstrators in Brown used a sit-in to protest a library's segregation and the OWS demonstrators used their occupation of the Financial District's Zuccotti Park to protest perceived corporate influence on government. In both cases, the expressive conduct at issue was so tied up with the

demonstrators' message that it gave name to the demonstration itself: the "sit-in" in Brown and

"Occupy Wall Street" here. In both cases, the location of the conduct was significant to the

message: in Brown, the site of a racially segregated government facility and here, an outdoor

plaza in the heart of one of the country's densest collection of financial services corporations. In

both cases, the conduct took place within the context of larger political and social movements:

the civil rights movement in Brown and the nation's extended public debate over the

government's role in economic regulation following the so-called "financial bailout" measures

authorized during the Great Recession. Those larger contexts supported a likelihood that the

conduct at issue would be understood by observers as conveying a particularized message. And

in this case, unlike the silent demonstrators in Brown, the OWS demonstrators combined their

expressive conduct with verbal speech, making their message even more particularized. Thus,

the OWS demonstrators' sustained physical presence in Zuccotti Park in the context of an

ongoing demonstration against income inequality was expressive conduct. See Mitchell v. City

of New Haven, 854 F. Supp. 2d 238, 246 (D. Conn. 2012) ("[T]he tents which Occupy members

have erected and inhabited, and even the act of sleeping in those tents, are themselves forms of

expression[,] . . . as courts throughout the country, faced with Occupy protests in their own cities,

have repeatedly found in recent months."); Watters v. Otter, 854 F.Supp.2d 823, 828-29,

(D.Idaho 2012); Occupy Columbia v. Haley, 866 F.Supp.2d 545, 557-58 (D.S.C. 2011); Occupy

Minneapolis v. Cnty. of Hennepin, 866 F.Supp.2d 1062, 1069 (D.Minn. 2011); Occupy Fort

Myers v. City of Fort Myers, 882 F.Supp.2d 1320, 1328 (M.D.Fla. 2011).

   In sum, Meyers adequately alleges the elements of a First Amendment retaliation claim.

And while the Supreme Court "has never recognized a First Amendment right to be free from a

retaliatory arrest that is supported by probable cause," Reichle v. Howards, 132 S. Ct. 2088,

2093 (2012), on the facts alleged, probable cause did not exist. The motion to dismiss the claim of First Amendment retaliation is therefore denied.

### 6. Meyers fails to state a claim for an unconstitutional time, place, or manner restriction on speech under the First Amendment.

Meyers alleges a separate violation of the First Amendment on the basis of an impermissible time, place, or manner restriction on speech. "A statute may unconstitutionally restrict speech in one of two primary ways." Field Day, LLC v. Cnty. of Suffolk, 463 F.3d 167, 174 (2d Cir. 2006). If it restricts speech based on the content of that speech, "it must be narrowly tailored to promote a compelling Government interest." United States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 813 (2000). "Such content-based restrictions are, almost always, unconstitutional . . . ." Field Day, LLC, 463 F.3d at 174. If, on the other hand, a statute aims to restrict not content, but only some action that incidentally restricts the time, place, or manner of speech, it is subject to a "level of judicial scrutiny that varies with the nature of the forum in which the speech occurs . . . ." Peck ex rel. Peck v. Baldwinsville Cent. Sch. Dist., 426 F.3d 617, 625 (2d Cir. 2005). Because Meyers's motion papers solely advance legal arguments applicable to time, place, and manner restrictions on speech, the Court assumes that he challenges a content-neutral regulation.

However, the Court need not and does not reach the issue of the level of judicial scrutiny applicable to regulations governing Zuccotti Park, because Meyers has inadequately identified a particular statute, rule, or policy alleged to be unconstitutional. Meyers's complaint references "a forcible eviction of occupants of Zuccotti Park" pursuant to a policy or rule of falsely arresting persons engaged in First Amendment activity in public spaces in New York City. Complaint ¶¶ 56, 82. Yet his brief alternately addresses "the private owner's broad rule prohibiting any structure to be erected" and "a rule particularly directed at tents and sleeping bags" in Zuccotti

Park. Brief in opposition, at 19-20. For its part, the City believes that "[t]he restriction plaintiffs put at issue is the temporary closing of the park so it can be cleaned and maintained." Brief in support, at 15.

The confusion over the exact regulation at issue shows that Meyers has not provided the City with adequate notice as to the accusation it faces and therefore denies it the ability to mount an appropriate defense. See Wynder v. McMahon, 360 F.3d 73, 79 (2d Cir. 2004) ("The key to Rule 8(a)'s requirements is whether adequate notice is given."); id. (defining "fair notice as that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so that it may be assigned the proper form of trial" (internal quotations omitted)). The question of whether a "broad rule" prohibiting any structure passes constitutional muster differs from whether a rule "particularly directed at tents and sleeping bags" does so. So too does an alleged policy of evicting First Amendment speakers from public spaces differ from one that mandates closing parks for cleaning and maintenance. To be clear, the Court expresses no opinion as to the constitutionality of any of these regulations. But the City is entitled to know which of them is at issue, so that it has a fair opportunity to meet its burden to justify the regulation or its enforcement as constitutional. Accordingly, the Court dismisses Meyer's time, place, and manner First Amendment claim.

### 7. The individual defendants are not entitled to qualified immunity on the facts alleged.

"'Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law.'" Garcia v. Does, 779 F.3d 84, 92 (2d Cir. 2015) (quoting Russo v. City of Bridgeport, 479 F.3d 196, 211 (2d Cir.2007)). "'An officer is entitled to qualified immunity against a suit for

false arrest if he can establish that he had 'arguable probable cause' to arrest the plaintiff.'" Id.
(quoting Zalaski v. City of Hartford, 723 F.3d 382, 390 (2d Cir.2013)). "'Arguable probable
cause exists if either (a) it was objectively reasonable for the officer to believe that probable
cause existed, or (b) officers of reasonable competence could disagree on whether the probable
cause test was met.'" Id. (quoting Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir.2004)). "'The
relevant, dispositive inquiry in determining whether a right is clearly established is whether it
would be clear to a reasonable officer that his conduct was unlawful in the situation he
confronted.'" Id. (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)). "A qualified immunity
defense can be presented in a Rule 12(b)(6) motion, but the defense faces a formidable hurdle
when advanced on such a motion and is usually not successful." Field Day, LLC v. Cnty. of
Suffolk, 463 F.3d 167, 191-92 (2d Cir. 2006) (internal alterations and quotations omitted). This
is because a claim of qualified immunity will succeed only "if the defense appears on the face of
the complaint." McKenna v. Wright, 386 F.3d 432, 436 (2d Cir. 2004). Relying solely on the
face of Meyers's complaint, the City's qualified immunity defense is not successful.

Meyers accuses the individual defendants of arresting and prosecuting the OWS
demonstrators, without probable cause, in retaliation for exercising their First Amendment rights
to engage in political speech. "[T]he law is settled that as a general matter the First Amendment
prohibits government officials from subjecting an individual to retaliatory actions, including
criminal prosecutions, for speaking out." Hartman v. Moore, 547 U.S. 250, 256 (2006). In 2011,
no officer of reasonable competence could dispute that point. If, as Meyers alleges, the
individual defendants knew that the OWS demonstrators were engaged in First Amendment
speech in a manner that complied with all laws, Complaint ¶¶ 27, 34, 37, and arrested them in
retaliation for that speech, they are not entitled to qualified immunity.

### 8.  Meyers states a claim for municipal liability.

Under <u>Monell v. Dep't of Soc. Servs. of City of New York</u>, 436 U.S. 658, 694 (1978), a municipality may be held liable under § 1983 when a "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Meyers claims that the City of New York is liable here because the mayor, police commissioner, and police chief were final policymakers who personally devised and ordered the allegedly unconstitutional arrests and prosecutions of the OWS demonstrators.

"Where a plaintiff seeks to hold a municipality liable for a single decision by a municipal policymaker, the plaintiff must show that the official had final policymaking power." <u>Roe v. City of Waterbury</u>, 542 F.3d 31, 37 (2d Cir. 2008) (citing <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 123 (1988) (internal quotations and alterations removed). "Moreover, the challenged actions must be within that official's area of policymaking authority." <u>Id.</u> "Mayors may be treated as policy-makers without proof of their specific powers and responsibilities." <u>Rookard v. Health & Hospitals Corp.</u>, 710 F.2d 41, 45 n.4 (2d Cir. 1983) (citing <u>Quinn v. Syracuse Model Neighborhood Corp.</u>, 613 F.2d 438, 448 (2d Cir.1980) ("Surely the mayor is the one city official whose edicts and acts represent municipal policy, especially when he joins other high-ranking municipal officers in devising and successfully implementing the plan" to deprive a plaintiff of constitutional rights.). Accord <u>Tower Properties LLC v. Vill. of Highland Falls</u>, 2015 WL 4124499 at *16 (S.D.N.Y. July 7, 2015); <u>Doe v. Vill. of Mamaroneck</u>, 462 F.Supp.2d 520, 560 (S.D.N.Y.2006).

Because Meyers alleges that the former mayor devised and ordered the OWS demonstrators' allegedly unconstitutional arrests, and because the mayor may be treated as a

policymaker without proof of his specific powers and responsibilities, the Monell claim against the City of New York survives.

## IV.    CONCLUSION

For the reasons described above, the City's motion to dismiss the claims grounded in violations of the First Amendment based on an impermissible time, place, and manner restriction, the Fourth Amendment based on eviction without a warrant, and the Fourteenth Amendment's Due Process Clause based on eviction without notice and an opportunity to be heard is **GRANTED**.

"In the ordinary course, the Federal Rules of Civil Procedure provide that courts should freely give leave to amend a complaint when justice so requires. Fed.R.Civ.P. 15(a)(2). This permissive standard is consistent with our strong preference for resolving disputes on the merits." Williams v. Citigroup Inc., 659 F.3d 208, 212-13 (2d Cir. 2011) (internal quotation marks omitted). Accordingly, Meyers may his amend his complaint as to those claims. The City's motion to dismiss all other claims is **DENIED WITHOUT PREJUDICE**.

The Court also schedules a status conference for _November 23_, 2015 at _11 : 00 a_.**m**. Counsel for the parties should report to Courtroom 1306 at the Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, NY 10007.

**SO ORDERED.**

**Dated:  October 27, 2015**
**        New York, New York**

_____
**ANDREW L. CARTER, JR.**
**United States District Judge**