**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

**CHARLES MEYERS, ET AL.,**  :
                            :
                **Plaintiffs,** :
                            :      **1:14-cv-09142 (ALC)**
        **-against-**        :
                            :      **OPINION & ORDER**
**THE CITY OF NEW YORK, ET AL.,** :
                            :
                **Defendants.** :
-------------------------------------------------------------------x

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiffs Charles Meyers, John Baker, Justin Strekal, and Miles Walsh, who were Occupy

Wall Street protestors, bring this putative class action pursuant to 42 U.S.C. § 1983 against

Defendant City of New York for allegedly evicting Plaintiffs from Zuccotti Park and arresting

them in violation of their First, Fourth, and Fourteenth Amendment rights. Am. Compl., ECF No.

48. Parties now cross move for judgment on the pleadings under Fed. R. Civ. P. 12(c). After

considering parties' motions, Defendant's Motion for Judgment on the Pleadings is **GRANTED**;

Plaintiffs' motion is **DENIED** as moot. ECF Nos. 109, 106.

## BACKGROUND

### I.    Statement of Facts

As the Court has described the facts in greater detail in its earlier opinions, only a brief

overview is provided here. Between September and October of 2011, Plaintiffs began residing in

Zuccotti Park, a privately-owned public space in New York City's financial district, as part of the

Occupy Wall Street movement. *Id.* at ¶¶ 155-181. Zuccotti Park was developed as a result of a

bargain between U.S. Steel and the City whereby the City provided U.S. Steel a Special Permit to

build an office tower without regard to height and setback regulations in exchange for U.S. Steel

developing and maintaining a permanent open park. *Id.* at ¶¶ 48-50. On October 10, 2011, the Wall Street Journal published an article regarding the protestors' right to occupy Zuccotti Park, which included then-Mayor Michael Bloomberg's position on the issue. *Id.* at Ex. G. Mayor Bloomberg stated, *inter alia*, that "'as long as [the protestors] obey the laws, we'll allow them to [express themselves] . . . If they break the laws, then, we're going to do what we're supposed to do: enforce the laws.'" *Id.*

On or about 1:00 a.m. of November 15, 2011, NYPD officers, via bullhorn, ordered all individuals in the park to leave and to take their personal possessions, or to face arrest. *Id.* at ¶¶ 151, 197. The NYPD's actions were allegedly motivated by the unsafe conditions that had developed in Zuccotti Park due to protestors prolonged occupation, including fire hazards and criminal activity. Def.'s Mem. Supp. Mot. J. Pleadings 3, ECF No. 111. Additionally, the owners of Zuccotti Park at the time of the occupation, Brookfield Properties, requested the City's assistance in temporarily relocating the occupants of Zuccotti Park on the understanding that Zuccotti Park would be reopened to the public once safe conditions were restored. *Id.* at 3-4.

After ordering the occupants of Zuccotti Park to disperse, NYPD officers and other City workers allegedly destroyed tents "using dangerous edged tools" and "seized all of the property [Plaintiffs] had on their persons, including their household property." Am. Compl. ¶ 152-154, ECF No. 48. Approximately 148 of the 350 protestors, including Plaintiffs, chose not to comply with the NYPD's dispersal order, choosing instead to lock their arms together while sitting on the ground and refusing to leave. Def.'s Mem. Supp. Mot. J. Pleadings 5-6, ECF No. 111. In response, NYPD officers arrested Plaintiffs and charged them with trespass, obstruction of governmental administration, and disorderly conduct. Def.'s Mem. Supp. Mot. J. Pleadings 6, ECF No. 111.

## II.    Relevant Procedural History

Defendants had previously moved to dismiss the complaint for failure to state a claim, which the Court granted in part and denied in part. ECF No. 47. After remand by the Second Circuit regarding the qualified immunity of the individual Defendants named in the case, the Court granted Defendants' Motion to Dismiss as to the individual Defendants leaving the City of New York as the sole Defendant. ECF Nos. 68, 78. Defendant City of New York answered the Amended Complaint and, in its answer, asserted the affirmative defense of probable cause. ECF No. 93. Plaintiff has now moved for judgment on the pleadings per Fed. R. Civ. P. 12(c) on Defendant's affirmative defense of probable cause, which Plaintiff argues Defendant cannot properly assert as a matter of law to Plaintiffs' Fourteenth Amendment claims. ECF No. 106. Conversely, Defendant has cross-moved for judgment on the pleadings for Plaintiff's failure to allege municipal liability, which Defendant argues warrants dismissal of the case as a matter of law. ECF Nos. 109.

## STANDARD OF REVIEW

"When deciding Rule 12(c) motions for judgment on the pleadings, a court employs the standard that applies to motions to dismiss a complaint under Rule 12(b)(6). Thus, a court must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the non-movant." *Walker v. Sankhi*, 494 F. App'x 140, 142 (2d Cir. 2012) (citing *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011)). This tenet, however, is "'inapplicable to legal conclusions.'" *Martine's Serv. Ctr., Inc. v. Town of Wallkill*, 554 F. App'x 32, 34 (2d Cir. 2014) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Simply put, to survive a Rule 12(c) motion, "[t]he complaint must plead 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.*

Finally, "[o]n a 12(c) motion, the court considers the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *L-7 Designs, Inc.*, 647 F.3d at 422.

Here, the Court need only decide Defendant's motion because a finding that Plaintiffs' Complaint does not provide factual content from which the Court can infer that Defendant, a municipality, is liable, would warrant a wholesale dismissal of the Complaint. The foregoing analysis will show that Defendants are entitled to judgment on the pleadings because Plaintiffs have not plead a constitutional violation, which in turn renders Plaintiffs' Motion for Judgment on the Pleadings as to the affirmative defense of probable cause moot.

## ANALYSIS

Defendant's primary contention is that Plaintiffs have failed to meet the standard under the law to allege municipal liability; namely, Plaintiffs have not adequately pleaded either that Defendant had a formal policy that led to a constitutional violation, or that Defendant's failure to train officers led to a constitutional violation. Def.'s Mem. Supp. Mot. J. Pleadings 9-13, ECF No. 111. Defendant further asserts that regardless of whether the Court finds that Plaintiffs have not plead municipal liability, Plaintiffs have failed to plead a constitutional violation, which absolves the City of any liability. *Id.* at 13-14.

In *Monell v. Dep't of Soc. Servs. of City of New York*, the Supreme Court held that a municipality can be liable under § 1983 where the "action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." 436 U.S. 658, 690 (1978). Thus, to successfully lodge a claim against a municipality for the actions of a public official, a plaintiff must prove: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3)

causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008).

In the absence of an official policy, *Monell* liability can also attach based on a single decision by a municipal policymaker so long as a plaintiff can show (1) "that the official had final policymaking power;" (2) that the challenged action was within the "official's area of policymaking authority;" and (3) that the policymaker had "final authority," meaning that her "decisions, at the time they are made, may fairly be said to represent official policy." *Id.* at 37.

The Supreme Court has been clear, however, that a municipality "cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 659. As "governmental bodies can act only through natural persons . . . these governments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988). In other words, "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the moving force behind the alleged injury." *Roe*, 542 F.3d at 37.

Finally, even if there was a municipal policy or a policymaker whose decision led to a plaintiff's injuries, such injury provides no basis for liability unless it amounts to a constitutional violation. *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S. Ct. 1571, 1573, 89 L. Ed. 2d 806 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point."); *Matican v. City of New York*, 524 F.3d 151, 154 (2d Cir. 2008) (holding that if an officer's actions did not violate the plaintiff's constitutional rights, the "City cannot be liable to [the plaintiff] under § 1983, regardless of whether the officers acted pursuant to a municipal policy or custom."); *Fappiano v. City of New*

*York*, 640 F. App'x 115, 121 (2d Cir. 2016) ("In the absence of an underlying constitutional violation by a city employee there is no municipal liability under *Monell*."); *Burgess v. DeJoseph*, 725 F. App'x 36, 40 (2d Cir. 2018) (affirming dismissal of the plaintiff's claims against a municipality because there "no underlying constitutional violation . . . .").

Accordingly, the Court will first consider whether Plaintiff has sufficiently pleaded that an official policy or the decision of a policymaker motivated the actions of the NYPD in this case. Next, the Court will determine if Defendant's officers' actions rise to the level of a constitutional violation. Based on an analysis of parties' briefs and the underlying supporting documents of which the Court takes judicial notice, the Court holds Plaintiffs' *Monell* claim fails because there is no constitutional violation alleged.

## I. Policymaker Decision

Plaintiffs assert in their opposition papers that they have sufficiently plead municipal liability under the policymaker prong.[1] Pls.' Mem. Opp. Def.'s Mot. J. Pleadings 16-17, ECF No. 112. Specifically, Plaintiffs point to their pleadings that Mayor Bloomberg, NYPD Commissioner Raymond Kelly, and NYPD Chief of Department Joseph Esposito approved the allegedly unconstitutional acts at issue in this case. *Id.*; *see also* Compl. ¶¶ 17-19, 199, 216, ECF No. 48. Plaintiffs also argue that in deciding Defendant's Motion to Dismiss, ECF No. 47, the Court already held that the facts in the Complaint were "adequate to establish municipal

---

[1] Plaintiffs do not argue in their opposition papers, nor can they, that there is any official custom or policy that provides the basis for *Monell* liability here. Indeed, the Complaint does not identify any official policy or custom; it only asserts in conclusory fashion that the alleged constitutional violations resulted from city policy that mandated false arrests and malicious prosecutions of persons engaged in First Amendment activity. *See* Compl. ¶¶ 211-216, ECF No. 48. Courts have routinely held such general assertions to be insufficient to survive a motion for judgment on the pleadings. *See, e.g.*, *Cuevas v. City of New York*, No. 07 CIV. 4169 (LAP), 2009 WL 4773033, at *4 (S.D.N.Y. Dec. 7, 2009) ("Baldly asserting that Plaintiff's injuries are the result of the City's policies does not show this Court what the policy is or how that policy subjected Plaintiff to suffer the denial of a constitutional right."); *Brodeur v. City of New York*, No. 99 CIV. 651 (WHP), 2002 WL 424688, at *6 (S.D.N.Y. Mar. 18, 2002) ("The complaint flatly asserts that the City had a policy of stifling, discouraging and suppressing critics of the former Mayor and his administration by arresting them. However, absent from the complaint are specific factual allegations sufficient to establish that a municipal policy or custom caused Brodeur's alleged injury.").

liability." Pls.' Mem. Opp. Def.'s Mot. J. Pleadings 16-17, ECF No. 112. *See Meyers v. City of New York*, No. 1:14-CV-9142 ALC, 2015 WL 6503825, at \*17 (S.D.N.Y. Oct. 27, 2015), *vacated on other grounds*, 675 F. App'x 93 (2d Cir. 2017) ("Because Meyers alleges that the former mayor devised and ordered the OWS demonstrators' allegedly unconstitutional arrests, and because the mayor may be treated as a policymaker without proof of his specific powers and responsibilities, the *Monell* claim against the City of New York survives.").

After taking judicial notice of all the documents in this case available to the Court, the Court maintains its previous holding that Plaintiffs' have sufficiently alleged that a policymaker with final decision-making authority made a decision that represented official policy. The Affirmation of Deputy Mayor Cas Holloway confirms that former Mayor Bloomberg made the decision to remove Plaintiffs from the park, noting that the Mayor issued a statement regarding the removal a few hours after it had taken place. Decl. of Brachah Goykadosh (hereinafter "Goykadosh Decl.") Ex. C. ¶ 4, ECF No. 110-3. In his statement, which the Court also takes judicial notice of, Mayor Blomberg asserts in no uncertain terms that the "final decision to act was [his]." *Statement Of Mayor Michael R. Bloomberg On Clearing And Re-opening Of Zuccotti Park*, https://www1.nyc.gov/office-of-the-mayor/news/410-11/statement-mayor-michael-bloomberg-clearing-re-opening-zuccotti-park (last visited January 31, 2019). Given that Mayor Bloomberg did in fact devise and order the removal of Plaintiffs, and given that he had final decision-making authority, his decision can be treated as official policy for the purposes of *Monell* liability. The City, however, is ultimately not liable under *Monell* as Plaintiffs have failed to allege a constitutional violation.

## II.    <u>Constitutional Violation</u>

### a.  **First and Fourth Amendment Claims**

Defendant is entitled to judgment on the pleadings as to Plaintiffs' First and Fourth Amendment claims of false arrest, malicious prosecution, and First Amendment retaliation because there was probable cause for Plaintiffs arrests. Defendant is also entitled to judgment on Plaintiffs' First Amendment discrimination claim because Defendant's decision to temporarily close that park was a constitutional time, place, and manner restriction.

"The First Amendment, applicable to the States through the Fourteenth Amendment, provides that 'Congress shall make no law ... abridging the freedom of speech.'" *Virginia v. Black*, 538 U.S. 343, 358 (2003) (quoting U.S. Const. amend. I). Moreover, state actors may not take actions in retaliation for individuals exercising their First Amendment rights, i.e., take actions to harm individuals *because* they exercised their First Amendment rights. *Smith v. Campbell*, 782 F.3d 93, 100 (2d Cir. 2015); *Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out.") (citations omitted).

On the other hand, "[u]nder the Fourth Amendment, made applicable to the States by the Fourteenth Amendment, the people are 'to be secure in their persons . . . against unreasonable searches and seizures . . . .'" *Maryland v. Pringle*, 540 U.S. 366, 369 (2003) (quoting U.S. Const. amend. IV). This includes protection from false arrest and malicious prosecution. *See Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (the Fourth Amendment protects the "right of an individual to be free from unreasonable seizures, including arrest without probable cause . . . ."); *Murphy v. Lynn*, 118 F.3d 938, 944 (2d Cir. 1997) (the Fourth Amendment provides the basis for a § 1983 claim that a "criminal prosecution was initiated against [an individual] without probable

cause . . . ."). In this case, Plaintiffs claim that they were lawfully occupying Zuccotti Park, hence their arrests and prosecution for refusing to vacate the park in response to an order by the NYPD allegedly amounted to false arrest, malicious prosecution, and First Amendment retaliation and discrimination. Compl. 53-59, ECF No. 48. Defendant argues their actions were supported by probable cause.

It is well established that probable cause is a complete defense to both First Amendment retaliation and Fourth Amendment false arrest and malicious prosecution claims. *See, e.g., Caravalho v. City of New York*, 732 F. App'x 18, 23 (2d Cir. 2018) (dismissing false arrest and First Amendment retaliation claims against the City of New York and individual officers where the officers had probable cause to arrest six Occupy Wall Street demonstrators who refused to comply with a dispersal order); *Fabrikant v. French*, 691 F.3d 193, 215 (2d Cir. 2012) (holding that the plaintiff's "claims of malicious prosecution, unreasonable search and seizure, and First Amendment retaliation fail because defendants had probable cause . . . ."). The Court holds that Defendant's actions were supported by probable cause thereby defeating Plaintiffs' claims of false arrest, malicious prosecution, and First Amendment retaliation.[2] The Court will consider Plaintiff's First Amendment discrimination claim separately.

---

[2] In its previous opinion, the Court found that the officers in this case entitled to qualified immunity because the officers had arguable probable cause for the arrests. *Meyers v. City of New York*, No. 14-CV-9142 (ALC), 2017 WL 4803922, at *1 (S.D.N.Y. Oct. 20, 2017), *appeal dismissed* (Jan. 10, 2018). The Court reached this conclusion because Plaintiffs' belief that they need not comply with the officers' dispersal order rested on a legal theory that was not clearly established at the time of arrest, and hence, it could not be said that "any reasonable officer would understand that an arrest under the circumstances would be unlawful." *Id.* at *2. Though the Court already concluded there was no constitutional violation in this case due to existence of arguable probable cause, the Second Circuit has held that "the entitlement of the individual municipal actors to qualified immunity because at the time of their actions there was no clear law or precedent warning them that their conduct would violate federal law is also irrelevant to the liability of the municipality. . . . Municipalities are held liable if they adopt customs or policies that violate federal law and result in tortious violation of a plaintiff's rights, regardless of whether it was clear at the time of the adoption of the policy or at the time of the tortious conduct that such conduct would violate the plaintiff's rights." *Askins v. Doe No. 1*, 727 F.3d 248, 254 (2d Cir. 2013). In light of the holding in *Askins*, the Court must now analyze whether the facts warrant a finding of probable cause, which would absolve the City of liability under *Monell* for Plaintiffs' false arrest, malicious prosecution, and First Amendment retaliation claim.

### i. False Arrest

To prevail on a claim of false arrest under New York state law a plaintiff must allege that "(1) the defendant intended to confine him [or her], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Sinagra v. City of New York*, 127 A.D.3d 729, 730 (N.Y. App. Div. 2015); *accord Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003). As already noted, probable cause is a complete defense to false arrest. In this context, "[p]robable cause exists where the facts and circumstances within . . . the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Marcavage v. City of New York*, 689 F.3d 98, 109–10 (2d Cir. 2012) (citing *Dunaway v. New York*, 442 U.S. 200, 208 n.9 (1979)). Practically speaking, this requires courts to "look at the facts as the officers knew them in light of the specific elements of the offense [while] considering the totality of the circumstances and the perspective of a reasonable police officer in light of his training and experience." *Caravalho*, 732 F. App'x at 22 (citing *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013)) (citing *United States v. Delossantos*, 536 F.3d 155, 159 (2d Cir. 2008)).

Defendant arrested Plaintiffs for disorderly conduct, trespass, and obstruction of governmental administration when Plaintiffs refused to vacate Zuccotti Park in response to Defendant's dispersal order. Defendant argues that it had probable cause for arresting Plaintiffs for each of these offenses, Plaintiff asserts otherwise. The Court concurs with Defendant and considers each offense in turn below.

### 1. *Disorderly Conduct*

The Court first holds that Defendant had probable cause to arrest Plaintiffs for disorderly conduct. Disorderly conduct "consists of the following elements: the individual (1) congregated with other persons in a public place; (2) was given a lawful order of the police to disperse; (3) refused to comply with that order; and (4) acted with intent to cause or recklessly created a risk of public inconvenience, annoyance or alarm." *Kass v. City of New York*, 864 F.3d 200, 211 (2d Cir.), *cert. denied sub nom. Kass v. City of New York*, N.Y., 138 S. Ct. 487 (2017); New York Penal Law § 240.20(6). Plaintiffs dispute that the third and fourth elements were present in the instant case. The Court disagrees—even drawing all reasonable inferences in favor of Plaintiffs, the facts and circumstances suggest that a Defendant's officers had sufficient information to warrant a reasonable belief that Plaintiffs were violating the disorderly conduct statute.

#### a. *Lawful Dispersal Order*

Under N.Y. Penal Law § 240.20(6), an officer's dispersal order is unlawful if it "was purely arbitrary and not calculated in any way to promote the public order." *Crenshaw v. City of Mount Vernon*, 372 F. App'x 202, 206 (2d Cir. 2010); *Kass*, 864 F.3d at 212 (accord). The facts here point to a dispersal order that was calculated to promote the public order and was not purely arbitrary. Defendant asserts that the dispersal order was issued because (1) conditions in the Park constituted a fire hazard; (2) there were increasing rates of criminal activity in the park; and (3) Brookfield Properties requested that the City temporarily remove occupants to redress these unsafe conditions. Def.'s Mem. Supp. Mot. J. Pleadings 2-4, ECF No. 111. The Court finds that any of these three circumstances would justify Defendant's dispersal order.

The City first notes that there were combustible items, smoking, and obstructions that created a fire hazard in Zuccotti Park. Goykadosh Decl., Ex. C. ¶ 7-8, ECF No. 110-3. This

finding was made, in part, by visual inspections conducted by Deputy Mayor Holloway the day prior to the removal of occupants as well as by inspections by the Fire Department ("FDNY"), who issued a fire code violation order to Brookfield Properties due to these conditions. *Id.* Plaintiffs argue, however, that the Fire Department was previously able to remove fire hazards without requiring dispersal of the demonstrators, and that the FDNY violation orders were sham ex post facto orders created by the City to cover their unlawful acts, vitiating the argument for probable cause. Pls.' Opp. Def. Mot. J. Pleadings 12, 14-15, ECF No. 112. Specifically, Plaintiffs note that the violation orders were dated November 15, 2011, the same day the park was cleared and cleaned at 1:00 a.m., and despite this, state that the park was filed with dangerous structures and personal property. *Id.* at 14-15.

There is undoubtedly ambiguity regarding the timing of the FDNY violation order and the City did not provide an explanation in response to Plaintiffs' argument. Yet this alone does not mean the City's conclusion that there was a fire hazard necessitating the removal occupants was arbitrary and not in furtherance of promoting public order. For example, Deputy Mayor Holloway's visual inspection, which confirmed there were combustible items, smoking, and other obstructions, provided one basis for the City to conclude that fire hazards existed in Zuccotti Park. Goykadosh Decl., Ex. C. ¶ 7, ECF No. 110-3. Additionally, FDNY had previously removed gasoline and diesel generators because there were safety concerns arising from their "proximity to a large quantity of flammable materials." *Id.* at ¶ 20. This provides further circumstantial evidence supporting Holloway and the City's conclusion that there were in fact an abundance of flammable materials in Zuccotti Park. Though FDNY took steps to redress the risk a few weeks prior to the removal of the occupants, this does not mean the fire hazard was

sufficiently minimized or that the risk of fires did not increase in the weeks following the initial steps taken by FDNY.

Regardless of how strong the City's basis was for concluding that there was a fire hazard, the City reasonably concluded that the increase in criminal activity in Zuccotti Park warranted a dispersal order. According to Holloway, "what was before a park with little to no crime [saw] approximately 73 misdemeanor and felony complaints and approximately 50 arrests since the movement began, and people who [had] a known history of violent interactions with the police [had] been observed." *Id.* at ¶ 18. Holloway also noted that "[m[akeshift items that can be used as weapons, such as cardboard tubes with metal pipes inside, had been observed . . . and, after the march on the Brooklyn Bridge, knives, mace and hypodermic needles were observed discarded onto the roadway." *Id.* at ¶ 17. Plaintiffs provide no response regarding why the increased rates of crime in Zuccotti Park coupled with the potentially dangerous items in the possession of some protestors did not provide a valid basis for a dispersal order. Given the appreciable risk to public safety, the City's dispersal order was calculated to uphold the public order, meaning the order was not arbitrary.

Finally, the City was acting, in part, at the behest of Brookfield Properties, which provides another basis for its dispersal order. On November 14, 2011, Brookfield expressed concern for "public safety and the fact that it [could not] operate the Park as it [was] required under its special permit" and requested assistance in removing occupants and their belongings so that Zuccotti Park could be "restored to its intended use and reopened to all." *Id.* at ¶ 23. It is undisputed that Brookfield is required to maintain Zuccotti Park as a public space open to all at all times, and Brookfield believed that it was unable to meet its obligations under the Special Permit while protestors continued to occupy Zuccotti Park. Plaintiffs instead assert that

13

Brookfield did not take any legal steps prior to November 15, 2011 to meet its obligations and did not obtain permission from the City Planning Commission ("CPC") for a nighttime closure as Plaintiffs claim Brookfield was required to under applicable zoning regulations. Pls. Opp. M. J. Pleadings 12, ECF No. 112; N.Y.C. Zoning Resolution § 37–727 ("All public plazas shall be accessible to the public at all times, except where the City Planning Commission has authorized a nighttime closing."). Plaintiffs arguments lack merit.

The Holloway Affirmation clarifies that in "mid-October, at the request of Brookfield Properties, the City worked with Brookfield to facilitate Brookfield's ability to remove demonstrators and their belonging on a temporary and section-by-section basis. Demonstrators were given approximately 24-hours advance notice of Brookfield's intent to conduct the cleaning effort." Goykadosh Decl., Ex. C. ¶ 14, ECF No. 110-3. In other words, Brookfield did attempt to take legal steps to meet its obligations under the Special Permit; but, in response to the notice that this cleaning would take place, 2000 protestors overflowed Zuccotti Park and made it "difficult and dangerous for the Police Department to attempt to remove people under those conditions." *Id.* at ¶ 15.

Next, Plaintiffs argument that only the City Planning Commission, not Brookfield, could have issued a nighttime closure is an incorrect interpretation of the zoning regulations. Under § 37-623 of the N.Y.C. Zoning Regulations, "[t]he City Planning Commission may, upon application, authorize the closing during certain hours of an existing plaza." The regulation categorizes "nighttime closings" as related to "hours of access," which leads the Court to conclude that permission is needed where a property owner seeks to limit the hours the public can access a public plaza generally. This regulation does not speak to Brookfield's prerogative to request police assistance to remove persons who hamper Brookfield's ability to maintain a

public space or those who create unsafe conditions for others. Moreover, Plaintiffs'
interpretation of the regulation is nonsensical. Under Plaintiffs' interpretation, Brookfield could
avoid violating the regulation by closing the park during the day to remove occupants.
Considering that Brookfield was concerned about the conditions at Zuccotti Park, which was
supported by the City's own investigation of the premises, the decision to issue a dispersal order
was lawful because it was calculated to promote the public order and thus, not arbitrary.

### b.  Public Inconvenience

Plaintiffs assert that the fourth element of disorderly conduct, that Plaintiffs acted with
intent to cause or recklessly create a risk of public inconvenience cannot be met because there
were no members of public present during the arrests to inconvenience. Courts have interpreted
the fourth element of disorderly conduct to require proof of that the conduct at issue had (1)
public ramifications, and (2) was intended to disrupt. *Caravalho*, v. *City of New York*, No.
13CV4174PKCMHD, 2016 WL 1274575, at *7 (S.D.N.Y. Mar. 31, 2016) (citing *Provost v. City
of Newburgh*, 262 F.3d 146, 157 (2d Cir. 2001)).

To assess whether conduct has public ramifications, courts consider "the time and place
of the episode under scrutiny; the nature and character of the conduct; the number of other
people in the vicinity; whether they are drawn to the disturbance and, if so, the nature and
number of those attracted; and any other relevant circumstances." *People v. Weaver*, 16 N.Y.3d
123, 128 (2011). The New York Court of Appeals has clarified that "there is no per se
requirement that members of the public must be involved or react to the incident. Rather, the
attention generated by a defendant's activities, or the lack thereof, is a relevant factor to be
considered . . . ." *Id.* As to intent, the statute does not require that the conduct at issue result "in
public inconvenience, annoyance or alarm if the conduct recklessly creates a risk of such public

disruption." *Id.* (citing *People v. Todaro*, 26 N.Y.2d 325, 329 (1970)); *Caravalho*, 2016 WL 1274575, at *7 (accord).  Plaintiffs primarily contest whether their actions had public ramifications.

The Court holds that Plaintiffs' conduct both had public ramification and was intended to disrupt.  Plaintiffs' assertion that there is no evidence on the record that members of the public were present during the arrest is of no moment.  At bottom, Plaintiffs refused to follow a dispersal order in a presumptively public space.  Even if Plaintiffs are correct that no members of the public were present, it was not unreasonable for police officers to believe there could be bystanders present in the area even at 1:00 a.m. given that Zuccotti Park was widely-publicized as the epicenter of a significant political demonstration.  *See generally Zalaski v. City of Hartford*, 723 F.3d 382, 393 (2d Cir. 2013) ("[B]ecause the practical restraints on police in the field are greater with respect to ascertaining intent . . . , the latitude accorded to officers considering the probable cause issue in the context of mens rea crimes must be correspondingly great.") (citation omitted).

Furthermore, it is not clear why the Plaintiffs do not consider the 202 protestors who followed the dispersal order, who did not seek to cause unrest, who did not risk arrest, and who were not arrested to be members of the public inconvenienced by Plaintiffs actions.  As the facts strongly suggest that Plaintiffs conduct had public ramifications and was intended to disrupt, even if it failed to do so, the final element of disorderly conduct was present.  Accordingly, the City had probable cause to arrest Plaintiffs for disorderly conduct.

## 2. *Trespass*

The Court next holds that Defendant had probable cause to arrest Plaintiffs for trespass. To support a prima facie case of criminal trespass in a public place, three elements must be met:

16

"(1) that a lawful order excluding the defendant from the premises was issued, (2) that the order was communicated to the defendant by a person with authority to make the order, and (3) that the defendant defied that order." *Carpenter v. City of New York*, 984 F. Supp. 2d 255, 265 (S.D.N.Y. 2013) (citing *People v. Munroe*, 18 Misc. 3d 9, 11, (App. Term 2007)); N.Y. Penal Law § 140.05. The Court has already concluded that the dispersal order was lawful; Plaintiffs remaining arguments are that Plaintiffs were not sufficiently warned regarding what constituted trespassing and that the officers did not have the authority to issue the dispersal order so there was no probable cause to arrest for trespass. Pls.' Opp. Def. Mot. J. Pleadings. 19-21, ECF No. 112.

Taking the issue of the authority of the police officers first, there is no question that Brookfield, the property owner, granted authority to the NYPD to carry out the removal of protestors. Plaintiffs cite *People v. Dailey* to argue that a property owner, not a police officer, has the authority to order the removal of persons who had a license to be on the property owner's land.[3] 69 Misc. 2d 691, 694 (Co. Ct. 1972). *Dailey*, however, also notes that police officers would be authorized to remove trespassers where they "have specific written authority to speak for an absent owner." *Id*. This was the case here. According to Holloway, Brookfield in a letter dated November 14, 2011 requested "that the City provide necessary assistance in having the tents and other belongings stored at the Park removed, and in having occupants temporarily relocated from the Park on the understanding that after this has occurred the Park will be restored to its intended use and reopened to all." Goykadosh Decl., Ex. C. ¶ 23, ECF No. 110-3.

---

[3] *Dailey* appears to be discussing New York law in the context of private rather than public property. The Court, however, need not delve deeper into this analysis, as the City's officers had clear permission to carry out the removal of occupants in this case.

On notice, Plaintiffs' argument misses the mark. Plaintiffs claim that they did not have fair warning that their conduct had become criminal and warranted their arrests. Pls.' Opp. Def. Mot. J. Pleadings 19-20, ECF No. 112. First, there were rules that Brookfield promulgated in September 2011, two months before the removal took place, which gave occupants notice of the types of conduct that Brookfield considered problematic. *See People v. Nunez*, 36 Misc. 3d 172, 180 (Crim. Ct. 2012) ("These rules included a prohibition on (i) camping and the erection of tents and other structures; (ii) lying down on the ground or lying down on benches, sitting areas or walkways in a manner that unreasonably interferes with the use of benches, sitting areas or walkways by others; (iii) the placement of tarps or sleeping bags or other coverings on the property; and (iv) the storage or placement of personal property on the ground, benches, sitting areas or walkways in a manner that unreasonably interferes with the use of such areas by others."). But, more importantly, Plaintiffs were not arrested for violating the rules, but for failing to comply with a valid dispersal order. That is the root of the trespass offense at issue in this case, and that is what provided the officers with probable cause.

To the extent that Plaintiffs claim that not everyone heard the order, this does not hinder a finding of probable cause. The Second Circuit has held that "[o]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Panetta v. Crowley*, 460 F.3d 388, 396 (2d Cir. 2006) (citation omitted). After the dispersal order was issued via bullhorn, and officers observed that Plaintiffs and others chose not to leave and instead began locking their arms together to protest the dispersal order, the officers had a reasonable basis for believing there was probable cause to arrest Plaintiffs. Even if some Plaintiffs had not heard the order, the officers could have reasonably believed from Plaintiffs' decision to lock

arms that they heard the order and were refusing to follow it. Considering these facts, the Court

finds that there was probable cause for arresting Plaintiffs for trespass.

### 3. *Obstructing Governmental Administration*

The Court also holds that there was probable cause for arresting Plaintiffs for obstructing

governmental administration. A person obstructs governmental administration where she

"intentionally obstructs, impairs or perverts the administration of law or other governmental

function or prevents or attempts to prevent a public servant from performing an official function,

by means of intimidation, physical force or interference, or by means of any independently

unlawful act . . . ." N.Y. Penal Law § 195.05. "An individual, therefore, may be convicted

under this statute when (1) a public servant is performing an official function; (2) the individual

prevents or attempts to prevent the performance of that function by interfering with it; and (3) the

individual does so intentionally." *Kass*, 864 F.3d at 207.

Defendant claims that Plaintiffs' choice to erect tents and other structures in Zuccotti

park was in contravention of N.Y.C. Admin. Code § 16-122(b), which makes it unlawful for any

person "to erect or cause to be erected thereon any shed, building or other obstruction" in a

public place. As Plaintiffs refused to allow Defendant to bring Zuccotti Park in line with the

administrative code, Defendant argues that its officers had probable cause to arrest Plaintiffs for

obstructing governmental administration. Defendant relies on *Betancourt v. Bloomberg*, 448

F.3d 547, 554 (2d Cir. 2006), where the Second Circuit found that police officers had probable

cause to arrest the plaintiff after they "observed him in a cardboard structure large enough to

house an adult human being, which he had erected in a public space." Plaintiffs raise two

contentions in response to Defendant's claim of probable cause: (1) § 16-122(b) only applies to

city-owned property, not to a privately-owned public space such as Zuccotti Park; and (2) the

N.Y.C. Administrative Code does not prohibit the use of tents in public spaces, it only regulates their use. Plaintiffs arguments are unavailing.

There is no convincing rationale to exempt Zuccotti Park from § 16-122(b). The statute applies to public places, of which Zuccotti Park is a variant, as Plaintiffs argue in earnest in their Complaint and motion papers. *Gersbacher v. City of New York*, No. 1:14-CV-7600-GHW, 2017 WL 4402538, at *7 (S.D.N.Y. Oct. 2, 2017) (accord). There is nothing in the statute that limits its applicability based upon who has an ownership interest in a public space, and Plaintiffs provide no reason as to why this interpretation should be applied here.

Next, the N.Y.C. Administrative Code provisions that regulate the use of tents in public spaces in circumstances authorized by the city[4] have no bearing on whether another provision of the code, such as § 16-122(b), prohibits such use in other circumstances. Here, Plaintiffs did not have permission to erect structures or tents in Zuccotti Park per the rules espoused by Brookfield and certainly did not have permission from the City. *People v. Nunez*, 36 Misc. 3d 172, 180 (Crim. Ct. 2012). Despite this, Plaintiffs and others erected tents, including a medical tent, and other structures during their time at Zuccotti Park. Goykadosh Decl., Ex. C. ¶¶ 11-13, ECF No. 110-3. And, the weekend prior to their removal, protestors also allegedly brought in "wooden pallets to elevate their tents and erect a wooden structure . . . ." *Id.* at ¶ 7. Plaintiffs do not contest these allegations, all of which point to an attempt to erect structures in contravention of § 16-122(b). Because Plaintiffs attempted to impede the NYPD from removing the tents and structures that were in violation of § 16-122(b), the NYPD had sufficient probable cause to arrest Plaintiffs for obstructing governmental administration.

---

[4] *See* Plaza Events, https://www1.nyc.gov/site/cecm/permitting/permit-types/plaza-events.page (las accessed January 31, 2019).

ii. <u>Malicious Prosecution & First Amendment Retaliation</u>

For malicious prosecution, a plaintiff must allege "(1) that the defendant initiated a prosecution against the plaintiff, (2) that the defendant lacked probable cause to believe the proceeding could succeed, (3) that the defendant acted with malice, . . . (4) that the prosecution was terminated in the plaintiff's favor[, and] (5) a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman v. New York City Transit Auth.* (NYCTA), 215 F.3d 208, 215 (2d Cir. 2000) (citations omitted). "To plead a First Amendment retaliation claim a plaintiff must show: (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by [plaintiff's] exercise of that right; and (3) the defendant's actions caused him some injury." *Smith v. Campbell*, 782 F.3d 93, 100 (2d Cir. 2015) (citation omitted).

The Second Circuit has held that "in the absence of exculpatory facts which became known after an arrest, probable cause to arrest is a complete defense to a claim of malicious prosecution." *D'Angelo v. Kirschner*, 288 F. App'x 724, 726 (2d Cir. 2008). In other words, so long as there was probable cause to arrest Plaintiffs for each of the crimes for which they were prosecuted, Plaintiffs malicious prosecution will fail in the absence of evidence to the contrary. The Second Circuit has also held that "[t]he existence of probable cause defeats a First Amendment claim premised on the allegation that defendants arrested a plaintiff based on a retaliatory motive." *Caravalho*, 732 F. App'x at 23 (citing *Fabrikant*, 691 F.3d at 215). As the Court has established why probable cause to arrest existed for each offense, Defendant is granted judgment on the pleadings as to Plaintiffs' malicious prosecution and First Amendment retaliation claim.

iii.  <u>First Amendment Discrimination</u>

As Zuccotti Park is a public forum "the government may apply content-neutral time, place, and manner restrictions only if they are 'narrowly tailored to serve a significant government interest' and if 'ample alternative channels of communication' are available." *Kass*, 864 F.3d at 208 (citing *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 341 (2d Cir. 2010) (per curiam)).  Plaintiffs discrimination claim is simply that Defendant's removal of Plaintiffs could not have been content neutral because (1) police action was only taken against protestors and not Brookfield, who allegedly could have been held accountable by the City for failing to maintain Zuccotti Park in accordance with the Administrative Code; and (2) the occupation of the park was in and of itself Plaintiffs' speech given that the purpose of the movement was to "Occupy Wall Street," ergo removing Plaintiffs was an attempt to stifle said speech.  Pls.' Opp. Def. Mot. J. Pleadings 29-30, ECF No. 112.

Drawing all reasonable inferences in favor Plaintiffs, the Court holds that Defendant's decision to remove protestors and temporarily close Zuccotti Park was a content neutral and narrowly tailored restriction.  Plaintiffs' argument that Defendant selectively applied police action to protestors is disingenuous when the facts show that Brookfield was cooperating with Defendant to ensure that it could maintain its obligations under the Special Permit.  In other words, there was no basis for Defendant to take action against Brookfield and thus, there is no basis to infer that Defendant's restrictions were geared toward the content of Plaintiffs speech.

Furthermore, temporarily removing Plaintiffs may have stifled a portion of their speech, i.e., the occupation, but the removal was constitutional because it was narrowly tailored.  "A restriction is narrowly tailored if it "'promotes a substantial government interest that would be achieved less effectively absent the regulation'" and it is "'not substantially broader than

necessary to achieve the government's interest.'" *Caravalho*, 732 F. App'x at 23 (citing

*Marcavage*, 689 F.3d at 106). As the Second Circuit noted in *Caravalho*, New York City has a

substantial interest in ensuring public spaces, like Zuccotti Park, remain safe and clean. *Id.*

Defendant's decision to *temporarily* remove Plaintiffs to redress the safety issues already

described was a narrowly tailored restriction—Plaintiffs were not being permanently denied

access to Zuccotti Park or being denied the ability to protest Wall Street. Even if there were a

better way for Defendant to have redressed the safety issues without hampering one aspect of

Plaintiffs' expression "[a] narrowly tailored restriction need not be the least restrictive or least

intrusive means of serving the government's interest" to be constitutional. *Id.* It being the case

that protestors could return to Zuccotti Park after it was cleaned to continue their protest or

protest elsewhere, the Court holds that Defendant's actions were constitutional. Defendant is

granted judgment on the pleadings as to Plaintiffs First Amendment discrimination claim.

### b. Fourteenth Amendment Claim

Defendant is also entitled to judgment on the pleadings as to Plaintiffs' Fourteenth

Amendment claim that Plaintiffs' were evicted without due process because Plaintiffs fail to

identify a property or liberty interest at stake. "The Due Process Clause of the Fourteenth

Amendment provides that no State shall 'deprive any person of life, liberty, or property, without

due process of law.'" *Tenenbaum v. Williams*, 193 F.3d 581, 592 (2d Cir.1999) (quoting U.S.

Const. amend. XIV § 1). Plaintiffs assert that the Fourteenth Amendment applies here because

Plaintiffs had a property and liberty interest in remaining in Zuccotti Park that they were

deprived of without due process when Defendants removed Plaintiffs without "fair warning" and

without a hearing. Pls.' Reply Supp. Mot. Partial J. Pleadings 5, ECF No. 115.

23

When assessing a due process claim, the first step is to ascertain "whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (quoting U.S. Const. amend. XIV § 1). Previously, Plaintiffs asserted that they had a property interest because the zoning regulations coupled with the statements of public officials created an easement granting Plaintiffs continuous access to Zuccotti Park. *Meyers*, 2015 WL 6503825, at *4 (S.D.N.Y. Oct. 27, 2015), *vacated on other grounds*, 675 F. App'x 93 (2d Cir. 2017). The Court rejected this argument and held that no easement existed to provide a basis for a Fourteenth Amendment claim. *Id*. at *4-*6.

Plaintiffs now assert that their property interest is an express easement that stems from Plaintiffs status as third-party beneficiaries of the contract between U.S. Steel (the original developer of Zuccotti Park) and the City that established Zuccotti Park as a permanent open park for the public benefit. Plaintiffs rely primarily on *McNeill v. New York City Housing Authority*, 719 F. Supp. 233, 248-49 (S.D.N.Y. 1989). In *McNeill*, the court held that public housing tenants could bring an action to enforce a contract between their landlord and the New York City Housing Authority because the tenants were third party beneficiaries of the contract and thus, had standing. *Id*. The court reasoned that the plaintiffs were "the sole and direct third-party beneficiaries" of the contracts and held that if plaintiffs' landlord breached the contract and the City failed to enforce the contract, then the tenants could "undertake such enforcement themselves." *Id*. at 249. *McNeill*, however, does not apply to the case at bar.

At the outset, *McNeill* is not binding on the Court; but, even if it were, the court in *McNeill* limited its holding to the facts of that case noting that "[i]n finding that plaintiffs are intended third-party beneficiaries, the [c]ourt does not open the door for all beneficiaries of government contracts to attempt to enforce such contracts." *Id*. Moreover, the question in

*McNeill* was not whether the tenants had a property interest at stake—this was undisputed as plaintiffs faced the possibility of permanent eviction from their homes as compared to protestors who were temporarily removed from a public space—rather, the question was whether tenants had standing to sue to enforce a contract to which they were not signatories. As such, *McNeill* does not stand for the proposition that an individual's status as third-party beneficiary creates a property interest. Rather, *McNeill* holds that a third-party beneficiary to a contract between a municipality and a private party has standing to bring a suit under § 1983 where the municipality and private party's failure to meet their contractual duties harms the beneficiary's *pre-existing property rights*. Consequently, even assuming Plaintiffs were the intended third-party beneficiaries of the contract between U.S. Steel and the City, this fact alone would be insufficient to find a cognizable property interest under the Fourteenth Amendment.

Plaintiffs also assert that their right to due process was violated when they were arrested without fair warning from Defendant that Plaintiffs occupation was unlawful. In their motion for judgment on the pleadings, Plaintiffs argue that Defendant's defense of probable cause cannot apply to Fourteenth Amendment claims. In making their argument, Plaintiffs cite *Cox v. Louisiana*, 379 U.S. 559 (1965) for the proposition that public officials violate due process where they do not provide fair warning to protestors before arresting them for violating in the law. Pls. Mem. Supp. Mot. J. Pleadings 11-12, ECF No. 107. Though the Court has already explained why Plaintiffs' motion is moot and the Court need not decide it, the Court will treat *Cox* as Plaintiffs' basis for arguing they had a liberty interest under the Fourteenth Amendment in this case that was violated without due process.

In *Cox*, a group of individuals protesting segregation on a street opposite to a courthouse were arrested and convicted of violating a statute that prohibited picketing or parading in or near

25

a courthouse. *Cox v. State of La.*, 379 U.S. 559, 568 (1965). Prior to the protest, B. Elton Cox, the leader of the protestors, sought permission for the demonstration and "the highest police officials of the city, in the presence of the Sheriff and Mayor, in effect told the demonstrators that they could meet where they did, 101 feet from the courthouse steps, but could not meet closer to the courthouse." *Id.* But, even after the protestors followed the officials' instructions, they were arrested because officials believed their protest breached the peace. *Id.* at 571-72.

In reversing Cox's conviction for violating the statute, the Supreme Court held: (1) because the dispersal order based on the breach of peace rationale was not valid, Cox was "still justified in his continued belief that because of the original official grant of permission he had a right to stay where he was for the few additional minutes required to conclude the meeting," *Id.* at 572; and (2) "convicting the demonstrators of demonstrating near the courthouse violated due process because the demonstrators were entitled to rely upon the police's interpretation of the statute, and thus lacked fair warning that they were violating the law." *Garcia v. Does*, 779 F.3d 84, 94 (2d Cir. 2015) (citing *Cox*, 379 U.S. at 571). Taken together, the Second Circuit has explained that "[a]s a matter of law, *Cox* establishes that, *under some circumstances*, demonstrators or others who have been advised by the police that their behavior is lawful may not be punished for that behavior. The extent of that principle is less than clear . . . ." *Id.* at 96 (emphasis added).

Although the case before the Court shares some similarities with *Cox*, these similarities are superficial—*Cox* is readily distinguished. Plaintiffs argue that the dispersal order was unlawful because of the Mayor's prior statement granting Plaintiffs permission to protest in Zuccotti Park, meaning Plaintiffs were justified in their noncompliance. But, unlike *Cox*, Mayor Bloomberg's prior statement did not advise Plaintiffs that the behavior for which they were

evicted was lawful. Bloomberg's statement was only that protestors could remain in the park so long as they did not violate any laws—Bloomberg did not state they could erect tents or other structures that violated N.Y.C. Administrative Codes and Zuccotti Park Rules, and that also created potential fire hazards. Put simply, the protestors in *Cox* were arrested for doing what they were told they could do, which was unlawful, whereas Plaintiffs were arrested for doing what they were never given permission to do in the first place.

And as to Plaintiffs' claim of a lack of fair warning prior to their arrest, the NYPD tried to remove protestors' tents at least twice before the events at issue here, and one of those instances appears to be after Bloomberg's statement. Goykadosh Decl., Ex. C. ¶¶ 11-13, ECF No. 110-3. Both of these attempts, neither of which resulted in criminal consequences for protestors as far as the Court is aware, arguably gave Plaintiffs constructive notice and fair warning that the way in which they were occupying Zuccotti Park was unlawful further dampening their Fourteenth Amendment claim. Accordingly, Plaintiffs fail to allege a violation of their Fourteenth Amendment rights and Defendant is entitled to judgment on the pleadings.

## CONCLUSION

For the reasons set forth above, Defendant's motion is **GRANTED**; Plaintiffs' motion is **DENIED** as moot.

**SO ORDERED.**

Dated:  March 28, 2019
      New York, New York

                                 **ANDREW L. CARTER, JR.**
                                 **United States District Judge**